# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PERSONAL TOUCH HOLDING CORP., <br><br> Plaintiff, <br><br> v. <br><br> FELIX GLAUBACH, D.D.S., <br><br> Defendant <br> FELIX GLAUBACH, D.D.S., <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> PERSONAL TOUCH HOLDING CORP., <br><br> Counterclaim Defendant. | C.A. No. 11199-CB |

## MEMORANDUM OPINION

Date Submitted: November 15, 2018
Date Decided: February 25, 2019

Blake Rohrbacher, Brian F. Morris, and John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jonathan C. Sullivan and John A. DeMaro, RUSKIN MOSCOU FALTISCHEK, P.C., Uniondale, New York; *Attorneys for Plaintiff-Counterclaim Defendant Personal Touch Holding Corp.*

Theodore A. Kittila and James G. McMillian, III, HALLORAN FARKAS KITTILA LLP, Wilmington, Delaware; *Attorneys for Defendant-Counterclaim Plaintiff Felix Glaubach, D.D.S.*

**BOUCHARD, C.**

This action involves a series of disputes between Personal Touch Holding Corp., a provider of home healthcare services, and one of its co-founders, Felix Glaubach. In April 2015, after tensions had been mounting between Glaubach and his fellow directors for some time over the company's management, Glaubach announced to the company's board of directors that he had purchased a building the company was interested in acquiring (the "AAA Building") and then offered to lease the building to the company. About two months later, the company terminated Glaubach's employment agreement and removed him as President of the company for allegedly usurping a corporate opportunity and other reasons. Personal Touch then filed this action, seeking a declaration that Glaubach was validly removed from office, damages for his alleged breaches of fiduciary duty, and disgorgement of three years of his compensation under the New York faithless servant doctrine.

In this post-trial decision, the court concludes that Glaubach breached his fiduciary duty of loyalty in several respects, including through his usurpation of the opportunity to acquire the AAA Building, and that the company is entitled to a declaration that Glaubach was validly removed as President of the company and to $2,735,000 in damages. With respect to a number of other claims the company advanced against Glaubach, the court concludes that Glaubach did not breach his fiduciary duties and that disgorgement of his compensation under the faithless servant doctrine is not warranted.

1

## I.   BACKGROUND

The facts recited in this opinion are my findings based on the testimony and documentary evidence presented at a four-day trial held in June 2018. The record includes stipulations of fact made in the Pre-Trial Stipulation and Order ("PTO"), nearly 700 trial exhibits, thirty-five depositions, and live testimony from six fact witnesses and one expert witness.

### A.   The Parties and Relevant Non-Parties

In 1974, Felix Glaubach, an orthodontist, and non-party Robert Marx, a lawyer, co-founded the organization that later became Personal Touch Holding Corp. ("Personal Touch" or the "Company").[1] In the beginning, Glaubach became involved in Personal Touch's business and continued his orthodontic practice part-time, while Marx devoted most of his time to his law practice and his investments.[2] They later became equal partners in the business.

Personal Touch is a Delaware corporation with its principal place of business in Lake Success, New York.[3] The Company provides home healthcare services, including nursing, physical therapy, and long-term care. It currently operates through various subsidiaries with locations in seven different states.[4]

---

[1] PTO ¶ 10; Tr. 210-12 (Glaubach); 622-23 (Marx).

[2] Tr. 212-13 (Glaubach).

[3] PTO ¶ 9.

[4] PTO ¶ 10; Tr. 8 (Goff).

Glaubach served as President of the Company from December 13, 2010 until June 24, 2015, when he was terminated from that position.[5] Glaubach, together with his wife and family trusts, currently holds approximately 27% of the Company's outstanding common stock.[6] At the time of trial, Glaubach was about eighty-eight years old, and had been married to his wife for over fifty-eight years.[7]

Glaubach and Marx currently serve as special directors of the Company's board of directors (the "Board"), entitling them to three votes each.[8] The Board has four other members, each of whom is entitled to one vote.[9] They are: John L. Miscione, John D. Calabro, Lawrence J. Waldman, and Robert E. Goff (collectively, the "Outside Directors").[10] Marx is Chairman of the Board and the Company's Senior Legal Officer.[11]

Two other individuals prominent in this action are David Slifkin and his wife, Dr. Trudy Balk.[12] Slifkin joined the Company in 1990 and served as its CEO from

---

[5] PTO ¶¶ 21, 23.

[6] PTO ¶ 11.

[7] Tr. 209-10 (Glaubach).

[8] PTO ¶¶ 15-16.

[9] JX 24 at 6.

[10] PTO ¶ 16.

[11] Tr. 623 (Marx).

[12] PTO ¶ 34.

3

January 31, 2011 until December 7, 2015.[13]  Slifkin resigned as CEO on the heels of an internal investigation that uncovered his central role in a tax evasion scheme involving many Company employees.  Balk joined the Company in 1980 and was its Vice President of Operations when she left the Company in July 2014.[14]

## B.    The Provision of Healthcare Services to Giza Shechtman

Giza Shechtman is Glaubach's sister-in-law and was an early equity owner in an affiliate of the Company, holding a five-percent stake.[15]  In or around 1996, after suffering a stroke, Shechtman began to receive healthcare services from the Company.[16]  According to Glaubach, shortly after Shechtman suffered her stroke, Glaubach, Marx, and Shechtman entered into an oral agreement for the Company to provide Shechtman with healthcare services at no cost as long as she needed them.[17]  Marx denies entering into this agreement.[18]

Whatever the initial arrangements may have been, they were superseded by a letter agreement that Glaubach, Marx, and Shechtman each signed in December 2001 (the "Services Agreement").[19]  The Services Agreement describes an

---

[13] PTO ¶ 20; JX 364 at 1.

[14] PTO ¶ 46.

[15] Tr. 211, 444 (Glaubach); Tr. 633 (Marx).

[16] Tr. 431-32 (Glaubach).

[17] Tr. 214-15, 432 (Glaubach).

[18] Tr. 635 (Marx).

[19] JX 8; Tr. 432-33 (Glaubach); Tr. 635 (Marx).

4

arrangement under which Shechtman would reimburse the Company for healthcare services it provided to her in the future. More specifically, the cost of the services would, in the first instance, come out of distributions she was entitled to receive as an equity owner:

> This is to confirm our understanding regarding the amount of your entitlement for your share of family benefits paid out of Personal Touch Home Care of N.Y., Inc.
>
> It is understood that you shall be entitled to 5% of this entitlement. Said amount shall be computed within two (2) months from the end of each fiscal year. This entitlement shall operate only as long as the undersigned are the sole owners of the Personal Touch Metro offices.
>
> It is further understood that at the end of each fiscal year when the computation has been made as per your entitlement, a deduction shall be made for any Nursing/Home Health Aide services which you may have incurred within the year at cost. If there is any money due in the computation it shall be paid to you upon the presentation of the computation.[20]

The Services Agreement further provided that "[i]n the event of a dispute as to the amount of [Shechtman's] entitlement, Mr. David Slifkin, our Chief Financial Officer, shall be the sole arbiter of said amount."[21] As Marx testified, the basic deal was "that Giza Shechtman herself will pay for her own services providing we pay

---

[20] JX 8. It appears that the intent of the Services Agreement was that Shechtman would reimburse the Company for the cost of healthcare services that exceeded her five-percent entitlement, although the language of the Services Agreement is confusing on that point. *See id.* ("If the cost of Nursing/Home Health Aide services that you have incurred exceed[s] the 5% of entitlement, then the excess shall be deducted from your 5% ownership distribution.").

[21] *Id.*

5

five percent of all the operations in the metropolitan area, which included Nassau, Suffolk, Westchester, the CHHA in Brooklyn, and the CHHA in Westchester."[22]

### C.    The ESOP Is Formed and Glaubach Becomes President

Glaubach and Marx were the controlling stockholders of the various Personal Touch companies until December 2010.[23] At that time, they implemented two major changes to both grow the Company and plan for succession.[24]

First, they established an employee stock ownership plan ("ESOP") and reorganized the Company's corporate structure into its current form.[25] Glaubach and Marx sold a substantial portion of their shares to a trust created for the ESOP for about $30 million each.[26] The ESOP trust now holds 31% of the Company's shares and is its largest stockholder.[27]

Second, Glaubach, Marx, and other stockholders entered into a stockholder agreement on December 13, 2010, that, among other changes, expanded the Board to up to eight members.[28] Glaubach and the Company simultaneously entered into

---

[22] Tr. 635 (Marx).

[23] PTO ¶ 12.

[24] Tr. 17 (Goff).

[25] PTO ¶ 12.

[26] PTO ¶ 13; Tr. 107 (Goff).

[27] PTO ¶ 13.

[28] PTO ¶ 14; JX 703 § 6.1.

an employment agreement (the "Employment Agreement") under which Glaubach would serve as President of the Company until December 2015 for an annual salary of approximately $650,000.[29]

In 2011, Miscione joined the Board from the investment firm of Duff & Phelps, which advised the Company on the formation of the ESOP.[30] Calabro, who spent many years at Heller Financial and Healthcare Finance Group, joined the Board in March 2014.[31] In July 2014, Waldman and Goff joined the Board.[32] Waldman is an accountant and Goff a healthcare executive, each with extensive experience in his respective field.[33]

## D. The AAA Building Becomes Available to Purchase

On or about February 28, 2013, Jim Clifford, the Director of Management Services at AAA New York ("AAA"), informed Mike Macagnone, the Director of Employee Services at the Company, that the building located next door to one of the Company's subsidiaries in Jamaica, New York (as defined above, the "AAA Building") was for sale. The Company had been seeking additional office space in Jamaica, New York for several years and was especially interested in the AAA

---

[29] PTO ¶¶ 21-22; JX 26.

[30] PTO ¶ 17.

[31] PTO ¶ 18.

[32] PTO ¶ 19.

[33] Tr. 9, 15 (Goff).

Building due to its location.[34]  Management believed that the AAA Building could be used to relocate the Company's corporate offices, to expand the Company's operations in the area, as additional office space for one of the Company's subsidiaries, or as storage.[35]

On March 4, 2013, Slifkin emailed Marx and Glaubach stating that the AAA Building "is up for sale and the asking price seems reasonable."[36]  Two days later, Marx, Glaubach, and Macagnone met with Clifford to see the building and discuss a price.[37]  Marx told Clifford that the Company was "very interested" in the property but that the asking price of $1,200,000 was "a little high."[38]  Marx then offered Clifford $1 million in cash for the building.[39]  A few days later, Clifford responded that AAA was concerned about the tax implications of the sale, which prompted Marx to offer to pay AAA's tax obligation as part of the transaction.[40]

Less than one month later, Clifford informed Marx that AAA could not proceed with a sale at that time because its relocation plans had fallen through.[41]

---

[34] PTO ¶ 105.

[35] PTO ¶ 106; *see also* Tr. 392 (Glaubach).

[36] PTO ¶ 104.

[37] PTO ¶ 108.

[38] PTO ¶ 109.

[39] Tr. 625 (Marx).

[40] Tr. 625 (Marx).

[41] Tr. 626 (Marx).

Marx continued to inquire with Clifford about the AAA Building for several months.[42] During one of those inquiries, Clifford told Marx that AAA wants "to move and we'll call you as soon as we have anything."[43]

### E.    The Shechtman Payment and the Jamaica Property

On July 22, 2013, Glaubach caused the Company to issue a check in the amount of $133,177 to Shechtman because he thought that Shechtman had been "shortchanged" in an equity distribution by the Company.[44] Leon Reimer, a certified public accountant who had been hired by the Company, provided the $133,177 figure to Glaubach.[45] Slifkin, believing that Glaubach had "the authority to request the check," instructed Anthony Castiglione, the Company's Treasurer at the time, to "cut the check" to Shechtman.[46]

On November 1, 2013, one of the Company's subsidiaries entered into a five-year lease with Personal Touch Realty LLC to rent a property in Jamaica, New York (the "Jamaica Property").[47] Marx and Glaubach each owned fifty percent of

---

[42] Tr. 626-27 (Marx).

[43] Tr. 627 (Marx).

[44] JX 56; JX 708 at 1; Tr. 446 (Glaubach).

[45] Tr. 223, 285 (Glaubach). Reimer had been hired by the law firm of Schlam Stone & Dolan LLP to assist the Company in connection with audits that the Internal Revenue Service and New York State were conducting for the 2010 tax year. JX 316 at 1-2, 4.

[46] Slifkin Dep. 424 (Sept. 28, 2017).

[47] JX 58; PTO ¶ 139.

Personal Touch Realty LLC at all relevant times.[48]  Only Marx and Glaubach signed

the lease—Marx for Personal Touch Realty LLC and Glaubach for the Company.[49]

Marx set the rental rate for the Jamaica Property.[50]

F.      **Glaubach Hires Reich and Pursues the AAA Building for Himself**

On or around January 1, 2014, Glaubach hired David Reich as "Assistant to

the President" with a salary of $100,000 per year.[51]  Glaubach asserts he hired Reich

primarily to assist him in exposing fraud that he suspected was occurring within the

Company.[52]  Reich was an employee of the Company from January 8, 2014 until

April 15, 2015, during which time he was paid a total of approximately $209,440.[53]

Also during this time period, Reich assisted Glaubach in acquiring the AAA

Building for himself.

In 2014, Glaubach instructed Reich to contact Clifford to see whether AAA

was ready to sell the AAA Building.[54]  Reich and Clifford discussed the sale of the

building during the summer of 2014.  Both were under the impression at the time

---

[48] PTO ¶ 140; JX 653.

[49] JX 58 at 5, 7.

[50] Tr. 279, 289 (Glaubach); JX 717 at 3.

[51] PTO ¶ 117; JX 712 at 1.

[52] Tr. 284 (Glaubach).

[53] PTO ¶¶ 119-20.

[54] PTO ¶ 112.

10

that they were negotiating the sale of the building to the Company.[55]   Clifford continued to have this impression until September 24, 2014.[56]

At some point before September 24, Glaubach told Reich that he wanted to buy the AAA Building himself in order to develop it or sell it for a profit.[57]   Glaubach did not want anyone at the Company to know about his negotiations regarding the AAA Building and made efforts to keep them secret.[58]   Reich thus stopped using his Company email account and began using a personal one in his communications about the AAA Building.[59]   Reich also suggested meeting with Clifford in a conference room in Reich's temple rather than on Company grounds because there were "a lot of blabbermouths" in the Company's offices.[60]

## G.   The Controversy About Balk's Severance Package

In February 2013, Glaubach purported to fire Trudy Balk, Vice President of Operations, for "unprofessional behavior and poor performance."[61]   Despite Glaubach's efforts to fire her unilaterally, Balk remained in her position until she decided to leave the Company in July 2014.  That event precipitated a controversy

---

[55] PTO ¶ 113.

[56] JX 713.

[57] PTO ¶¶ 114, 116.

[58] Tr. 397, 403 (Glaubach).

[59] Tr. 589-90 (Reich).

[60] JX 154 at 1.

[61] JX 47.

about paying Balk severance and allegations of tax fraud involving her husband (Slifkin) that ultimately led to his departure from the Company in December 2015.

On July 24, 2014, the Board met and unanimously adopted a resolution creating a special committee consisting of the Outside Directors (the "First Special Committee").[62] The First Special Committee was charged with negotiating a severance package with Balk and reviewing related-party transactions.[63] The First Special Committee also was empowered to amend and, if necessary, terminate any related-party transaction it discovered.[64] Relatedly, the Board resolved that "the Company shall not enter into" such a transaction "without the prior authorization of the [First] Special Committee."[65]

On July 29, 2014, Glaubach sent letters to two of the Outside Directors (Miscione and Goff) criticizing Balk's performance in her role as Vice President of Operations. In the letter to Miscione, Glaubach asserted that Balk had failed to exercise diligence with respect to certain of her professional duties.[66] In the letter to Goff, Glaubach made a range of allegations against Balk, including that she poorly supervised her employees, "violated federal laws/IRS regulations using Personal

---

[62] PTO ¶ 38.

[63] PTO ¶¶ 38-40.

[64] PTO ¶ 41.

[65] PTO ¶ 42.

[66] PTO ¶ 49.

12

Touch as a vehicle for her transgressions," and "conspired" to steal "one million airline points" from his American Express credit card account.[67] From Glaubach's perspective, the First Special Committee did not listen to any of the concerns he expressed to them.[68]

On August 15, 2014, Glaubach sent a letter to a third Outside Director (Waldman) regarding Balk's departure, stating the following:

> Since the full board determined that the Independent board members should make this decision, I'll accept whatever you decide in order to further promote the growth of the company as soon as possible. I was told that Dr. Balk will resign as of October 1, 2014. I can accept that and I am willing to pay her full salary plus benefits until that time. After that date, you suggest that she be able to serve as a consultant until April 1, 2015 and be paid on a per-diem basis. Although I am disappointed, I can accept that with the proviso that whatever she earns be included as part of her severance package and that no benefits whatsoever be paid to her after October 1, 2014. David [Reich] told me that you are suggesting a severance package of $466,000.00. I feel that that is a bit steep and if I have to live with it I will . . . .[69]

Elaborating on his views about the amount of Balk's severance, Glaubach explained that "the highest we've ever given for eighteen years of service was $55,000."[70]

On September 5, 2014, the First Special Committee agreed to pay Balk approximately $466,000 in severance, equating to approximately eighteen months

---

[67] JX 116 at 2-3.

[68] Tr. 252 (Glaubach).

[69] PTO ¶ 50; JX 136 at 2.

[70] Tr. 253 (Glaubach).

13

of her compensation.[71]  In support of this decision, the First Special Committee cited Balk's long tenure with the Company and asserted that the severance was "consistent with the past practices of the Company with regard to the separation of senior executives" as well as the practices of other companies.[72]

On September 8, 2014, Glaubach and Balk had an argument that allegedly resulted in Glaubach slamming the door to Balk's office and Balk crying.[73] Glaubach admits he told Balk that "she was worthless to the Company" but denies slamming the door.[74]  Goff heard about this incident from Irvin Brum, a lawyer with the Company's outside counsel (Ruskin Moscou Faltischek, P.C.), and from "other employees that were on the floor" at the time.[75]

On September 16, 2014, Slifkin sent Glaubach an email with the subject line "I SURRENDER - you won."[76]  Slifkin stated in the email that "Trudy [Balk] and I will be 100% gone by the end of the year" and that he would "have a full

---

[71] PTO ¶ 52.

[72] PTO ¶ 53; JX 100 at 1.

[73] Tr. 52-53 (Goff).

[74] Tr. 254 (Glaubach).

[75] Tr. 171 (Goff).

[76] JX 152 at 2.

14

management team in place" in the near future.[77]  He also offered to cover the cost of Balk's severance package by giving up shares in the Company.[78]

On September 22, 2014, about a week after sending the email to Glaubach, Slifkin wrote to the Board saying that the email to Glaubach "should not be construed as a resignation" and that he intended to remain with the Company "as long as the Board of Directors believes that me working as the CEO is in the best interest of the Company."[79]  Before Slifkin sent this letter, the Outside Directors had strongly encouraged him to stay on.[80]

In or around October 2014, Glaubach initiated a search for a new CEO to replace Slifkin without the involvement of anyone else on the Board.[81]  Glaubach reached out to two recruiting agencies that the Company had used previously and began interviewing candidates.[82]  Glaubach explained to the recruiting agencies that he "needed backup in case something goes wrong here."[83]  Justifying his actions,

---

[77] JX 152 at 2.

[78] *Id.*

[79] JX 156.

[80] JX 152 at 1.

[81] PTO ¶¶ 56, 58.

[82] PTO ¶ 57.

[83] Tr. 282 (Glaubach).

Glaubach explained: "I didn't feel as President of the Company I had to ask anyone. If they're telling me there's a problem, it's my job to solve that problem."[84]

### H. The Board Investigates Sexual Harassment Claims Against Glaubach

On or about September 16, 2014, Rachel Hold-Weiss, the Company's Associate General Counsel and Chief Compliance Officer at the time, informed Brum that she and two other female employees had alleged that Glaubach sexually harassed them by making inappropriate comments.[85] The other two employees were Josephine DiMaggio, an Administrative Assistant, and Pauline Vargas, Director of Purchasing and Web Development.[86] About one week later, the Company hired the law firm of Klein Zelman Rothermel Jacobs & Schess LLP ("Klein Zelman") to investigate the sexual harassment allegations.[87] When Glaubach first heard from DiMaggio that he was the target of the investigation, he replied, "Me? You got to be nuts."[88]

On October 23, 2014, Brum and his colleague informed Glaubach—who had been abroad for several weeks—about the sexual harassment investigation.[89] They

---

[84] Tr. 282-83 (Glaubach).

[85] PTO ¶¶ 54-55; Hold-Weiss Dep. 8, 136.

[86] PTO ¶ 54.

[87] PTO ¶ 59.

[88] Tr. 257 (Glaubach).

[89] PTO ¶ 60.

emphasized that the investigation had to be kept confidential and that Glaubach was prohibited from retaliating in any way against the complainants.[90] Glaubach took umbrage over the investigation, believing that Hold-Weiss "organized the false sexual harassment allegations against" him.[91] At a Board meeting on October 30, 2014, Glaubach told Hold-Weiss that he would "spend any amount of money to clear my name."[92]

Also on October 30, 2014, Glaubach sent a letter to the Board with the subject line "J'accuse, J'accuse."[93] In the letter, Glaubach contended that the Outside Directors had breached their fiduciary duties by approving Balk's severance package, which he described as "outrageous" and "ill-conceived."[94] He further stated that he would "throw in a bombshell regarding a historic pattern of misappropriation of funds and sexual misconduct, to put it nicely, on the part of the hierarchy of our company."[95] Glaubach also demanded that the Board rescind Balk's severance package and ask Slifkin to resign as CEO effective immediately,[96] and

---

[90] Tr. 451 (Glaubach).

[91] Tr. 260 (Glaubach).

[92] Tr. 458 (Glaubach).

[93] PTO ¶ 71; JX 180 at 1.

[94] PTO ¶ 72; JX 180 at 1.

[95] *Id*.

[96] PTO ¶ 74.

asserted that, in light of the circumstances, his giving up control of the Company was "definitely a grave mistake."[97]

On November 21, 2014, Klein Zelman issued a report concerning the sexual harassment allegations against Glaubach.[98] By agreement of the parties, the underlying allegations of sexual harassment were not the subject of testimony and are irrelevant to the issues that were tried, which focused only on the Company's allegation that Glaubach *retaliated* against the three complainants.[99]

On November 25, 2014, Glaubach instructed an employee of the Company to hang a painting of a red, jewel-encrusted hand grenade in the lobby of the Company's corporate offices.[100] The painting was created by Anton Skorubsky Kandinsky, a contemporary artist who was "noted for his grenade pictures" that "hang in museums all over the world."[101] Referring to the painting, Glaubach told an employee that there "is an explosive situation" within the Company and that "he does not know when it is going to blow up."[102]

---

[97] JX 180 at 1.

[98] PTO ¶ 61; JX 195.

[99] *See Personal Touch Hldg. Corp. v. Glaubach*, C.A. No. 11199-CB, at 14-16, 24 (Del. Ch. June 7, 2018) (TRANSCRIPT) (Dkt. 144); *see also* Dkt. 82 ¶ 25.

[100] PTO ¶ 75; JX 217 at 2.

[101] Tr. 267 (Glaubach).

[102] PTO ¶ 76; *see also* Tr. 270 (Glaubach).

Glaubach, who collects art and had a practice of hanging art around the office, testified that he brought the grenade painting into the office "because I like that piece of art."[103]  Slifkin removed the painting and emailed Glaubach stating that a "picture of a grenade is inappropriate to place in the work environment.  Employees feel uncomfortable particularly in light of the degree of animosity that is currently occurring at the company."[104]  Glaubach thereafter directed an employee to re-hang the painting.[105]

## I.      The Board Suspends Glaubach

Later on November 25, 2014, all the Board members except Glaubach held an emergency phone conference during which they unanimously agreed to suspend Glaubach with pay pending further Board action.[106]  Slifkin and Marx emailed Glaubach about the Board's decision, giving the following rationale:

> Despite being told on numerous occasions that you are not to retaliate in any way toward any complainant, you have ignored the Company's directives and continue to act in ways contrary to the Company's handbook and severely detrimental to its interests.  Further, your placing a picture of a grenade in front of Mr. Marx's office, and your refusal to permit its removal, is interpreted as an act of intimidation towards Mr. Marx and others at the Company.[107]

---

[103] Tr. 268 (Glaubach); PTO ¶ 75.

[104] PTO ¶ 77.

[105] PTO ¶ 78.

[106] PTO ¶¶ 79-80.

[107] PTO ¶ 80.

On December 4, 2014, Klein Zelman issued a supplemental report relating to the sexual harassment allegations.[108] On December 23, 2014, Glaubach sent a letter addressed to Slifkin stating that a "recent review of the Company's records going back several years has revealed that excessive reimbursements were made to you and other employees for Continuing Education expenses."[109] Glaubach also stated in the letter that he would "resort to further action" if Slifkin did not return the funds that were allegedly misappropriated.[110]

**J.     The Board Begins to Investigate Glaubach's Allegations of Tax Fraud While Glaubach Purchases the AAA Building**

On February 10, 2015, during a regularly scheduled meeting, the Board ratified its decision to suspend Glaubach with pay and extended his suspension for thirty days.[111] The Board also adopted resolutions (i) to create an audit committee (the "Audit Committee"), a corporate governance committee, and a compliance committee; and (ii) to authorize the Audit Committee to investigate the Company's compliance with financial and tax regulations, including with respect to allegations that Glaubach had made against Slifkin.[112]

---

[108] PTO ¶ 68; JX 231.

[109] PTO ¶ 28.

[110] PTO ¶ 29.

[111] PTO ¶ 87.

[112] PTO ¶ 83.

During the February 10 Board meeting, Marx "reported on . . . conversations that he had ongoing with the owners of the AAA Building."[113] Glaubach attended the meeting with his personal counsel but remained silent when Marx mentioned the AAA Building.[114] The next day, on February 11, 2015, Glaubach closed on his purchase of the AAA Building for $1.8 million plus six months' free rent for AAA.[115] Glaubach personally paid Reich $25,000 for his work on the deal.[116]

### K.   Glaubach Files a Lawsuit in New York and Tensions Continue to Rise Between Glaubach and the Rest of the Board

On March 31, 2015, Glaubach filed a derivative lawsuit in the New York Supreme Court against Marx, the Outside Directors, Slifkin, Balk, and four other employees (the "New York Action").[117] On January 15, 2016, Glaubach amended his complaint in the New York Action to add the Company and two of its subsidiaries as nominal defendants. The amended complaint alleges that Marx and other defendants "stole" millions of dollars from the Company and wrongly characterized the money they stole as reimbursement for continuing education expenses.[118] It

---

[113] Tr. 100 (Goff).

[114] PTO ¶ 84; Tr. 101 (Goff); JX 274.

[115] PTO ¶ 115.

[116] Tr. 532 (Reich); Tr. 284 (Glaubach).

[117] PTO ¶ 89; *Glaubach v. Slifkin*, Index No. 702987/2015 (N.Y. Sup. Ct. Aug. 15, 2018).

[118] PTO ¶ 90.

further alleges that the Outside Directors breached their fiduciary duties by "fail[ing] to act with respect to Glaubach's claims with any urgency."[119]

On April 29, 2015, the Board held what turned out to be a highly contentious meeting. Glaubach, represented by his personal counsel, asserted that he was being denied access to Company information.[120] The Board responded by saying that procedures had been established to provide Glaubach with information if requested in writing.[121] Glaubach asked whether Heller Financial and Healthcare Finance Group, one of the Company's lenders, was aware of the New York Action, and Slifkin said it was.[122] Glaubach accused one of the directors of committing graft, called Slifkin a "liar" and "philanderer," and stated that he was considering creating "dossiers" on all of the attorneys present and threatened to file grievances against them.[123] He also asserted he would not sign a written consent for the purchase of certain assets the Company had been considering acquiring unless Slifkin's name was removed from it.[124]

---

[119] PTO ¶ 91.

[120] PTO ¶ 96.

[121] PTO ¶ 96.

[122] PTO ¶ 97.

[123] PTO ¶ 98; Glaubach Dep. 774-75 (Sept. 8, 2017).

[124] PTO ¶ 99.

During the April 29 Board meeting, Glaubach announced that he had purchased the AAA Building and then offered to lease it to the Company.[125] This "surprised" Goff because the Company previously had been negotiating to purchase the AAA Building.[126] Months later, in a letter to Marx dated August 11, 2015, Glaubach again offered to lease the AAA Building to the Company.[127] Marx replied ten days later, asserting that Glaubach's purchase of the property "constituted a breach of your fiduciary duties as a director of the Company."[128]

## L.  Glaubach Is Terminated as President

On May 27, 2015, the Board created another special committee (the "Second Special Committee") that was empowered to decide all matters on which the Company or the Board may be adverse to Glaubach.[129] Specifically, the Second Special Committee was authorized to determine the Company's position on: (i) the allegations of sexual harassment, retaliation, and breaches of fiduciary duty involving Glaubach; (ii) claims made by Glaubach against the Company or its

---

[125] Tr. 101 (Goff); Tr. 407 (Glaubach); PTO ¶ 100; JX 309 at 8.

[126] Tr. 101 (Goff).

[127] JX 326.

[128] JX 329.

[129] PTO ¶ 101.

officers, directors, or employees; and (iii) actions to be taken against Glaubach regarding his professional relationship with the Company and related litigation.[130]

On June 22, 2015, the Second Special Committee voted to terminate Glaubach as President of Personal Touch.[131] The Company sent an official termination letter two days later, on June 24, which specified, among other reasons for the decision, that Glaubach had retaliated against the sexual harassment complainants, defied the Board by unilaterally initiating a search for a new CEO, interfered with the Company's purchase of the AAA Building, and misappropriated Company assets by having Reich work on personal matters and hiring a personal driver.[132] Also on June 24, 2015, the Company filed this action.[133]

## M. The Audit Committee Investigates Glaubach's Allegations of Tax Fraud and the Services Provided to Shechtman

On May 8, 2015, the Audit Committee, through its counsel James Alterbaum of the law firm of Moses & Singer LLP, hired Friedman LLP, an accounting firm, to perform a forensic investigation of the financial records of the Company to determine whether any directors or employees had received improper payments or

---

[130] PTO ¶ 101.

[131] PTO ¶ 102.

[132] JX 322 at 1.

[133] Dkt. 1.

other benefits.[134]  From August 27 to November 9, 2015, Friedman LLP issued a series of reports to the Audit Committee.[135]  The reports focused primarily on:  (i) certain payments the Company made to employees that were classified as "continuing education" expenses; and (ii) healthcare services that the Company had provided to Shechtman.

With respect to the first topic, Friedman LLP found that, from 2008 to 2011, dozens of employees of the Company, including Slifkin and Balk, received payments for bonus compensation that were characterized improperly in the Company's financial records as expense reimbursements for "continuing education" courses that were never taken.[136]  Friedman LLP did not conclude that any of the recipients actually evaded taxes,[137] although the evident purpose of the scheme was to mischaracterize compensation as "continuing education" expenses in order to reduce the taxable wage income of certain employees.[138]

Friedman LLP found that the Company made a total of approximately $519,965 of mischaracterized "continuing education" payments in 2008, $698,485

---

[134] JX 310 at 1.

[135] JX 346; JX 347; JX 348; JX 350; JX 351; JX 354.

[136] JX 348 at 3-4 (2008); JX 350 at 3-4 (2009); JX 346 at 3 (2010); JX 354 at 3 (2011); PTO ¶¶ 31-32; *see also* Tr. 222 (Glaubach) ("There was no such thing as [continuing education].  This was not done once.").

[137] Tr. 754 (Miano); *see* JX 346; JX 348; JX 350; JX 351; JX 354.

[138] *See* Tr. 133-34 (Goff).

in 2009, $844,194 in 2010, and $123,000 in 2011.[139] Slifkin was the biggest offender by far, receiving improperly classified "continuing education" payments of $107,754 in 2008, $220,000 in 2009, and $527,105 in 2010.[140]

Friedman LLP did not determine who was responsible for the mischaracterizations, apparently because that issue was outside the scope of its assignment,[141] but the record reflects that, at a minimum, Slifkin condoned the practice.[142] On December 7, 2015, about one month after Friedman LLP issued its last report, Slifkin resigned as an officer and director of the Company, effective immediately.[143] The Company's outside auditor, PricewaterhouseCoopers, also terminated its relationship with the Company after learning about the "continuing education" expense scandal.[144]

With respect to the healthcare services provided to Shechtman, Friedman LLP concluded that, from January 2010 to June 2014, the Company provided her with healthcare services and that "invoices were generated, but none of them were actually sent to Ms. Schectman [*sic*] for payment."[145] Instead, "revenue and

---

[139] PTO ¶ 32.

[140] JX 351 at 1, 3; JX 346 at 3; PTO ¶ 31.

[141] Tr. 755 (Miano).

[142] Tr. 193 (Goff); Tr. 756 (Miano).

[143] JX 365.

[144] Tr. 194 (Goff).

[145] JX 347 at 1-2.

accounts receivable were recorded to the [Personal Touch] general ledger for the services rendered to Ms. Schectman [*sic*] but were subsequently reversed and not reflected in the Personal-Touch Home Care and Affiliates Audited Combined Financial Statements."[146]   Friedman LLP's memorandum states that "Joann Piervinanzi, Director of Reimbursement, and Tom McNulty, A/R Manager, indicated that they believe the practices were initially approved by David Slifkin prior to the start of their employment with the Company."[147]

### N.     Glaubach Anonymously Sends Letters to the Other Directors and Various Employees

Beginning in March 2016, at least sixteen different individuals affiliated with the Company received anonymous letters.[148]   Recipients of these letters included Marx, each of the Outside Directors, Brum, Castiglione, DiMaggio, Macagnone, and some of their spouses.[149]   Many of the letters contained biblical references and intimated that the recipients were sinners.[150]

---

[146] *Id*. at 2.

[147] *Id*.

[148] Tr. 141 (Goff); *see* JX 374; JX 397; JX 398; JX 401; JX 402; JX 403; JX 405; JX 406; JX 407; JX 408; JX 410; JX 411; JX 415; JX 416; JX 417; JX 418; JX 419; JX 420; JX 421; JX 422; JX 445; JX 446; JX 447; JX 457; JX 458; JX 460; JX 461; JX 467; JX 473; JX 490; JX 495; JX 500; JX 501; JX 503; JX 504; JX 515; JX 640.

[149] PTO ¶¶ 121-24.

[150] PTO ¶ 125; Tr. 141 (Goff).

For example, one letter sent to Marx and others stated in red bold letters: "To all sinners BLOOD was the first plague[,] nine to follow, repent before its [*sic*] too late."[151] Another letter was sent to an employee after one of her parents had recently fallen and broken several bones.[152] It contained a picture of a doctor holding an x-ray of a broken bone and stated: "Who in your family is going to be stricken next as a result of your sins? REPENT BEFORE ITS [*sic*] TOO LATE!"[153] The same day that letter was sent out, Reich had emailed Glaubach asking him to "[p]ick which picture you like."[154] Other anonymous letters warned that the recipients would be reported to the IRS, prosecuted, or imprisoned.[155]

Glaubach's testimony concerning his role in sending the anonymous letters shifted during this case. In a verified interrogatory, Glaubach attested that "he prepared and disseminated each of the" anonymous letters "with assistance from David Reich and Sase Dihal."[156] When deposed, Glaubach denied any involvement in preparing and sending the letters.[157] In an errata sheet to his deposition testimony, Glaubach sought to change many of his answers, including to say he "was aware" of

---

[151] PTO ¶ 126; JX 387; JX 389; JX 495.

[152] Tr. 145 (Goff).

[153] PTO ¶ 131; JX 467.

[154] JX 471 at 1.

[155] PTO ¶¶ 128-29.

[156] JX 486 at 4.

[157] Glaubach Dep. 37, 40-41 (Apr. 27, 2018).

the letters and "approved most" of them.[158]  At trial, Glaubach testified that he did not actually send any of the anonymous letters, but that he composed some of them as a way "of blowing off steam."[159]  He further testified that Reich asked to send the letters and that he told Reich that "[i]f it's not illegal and you think it might help, send them out."[160]  Reich testified at trial that he "helped prepare" the letters and "sent them" at Glaubach's instruction.[161]  I credit Reich's testimony, which is consistent with Glaubach's initial interrogatory response, and find that Glaubach orchestrated the preparation and dissemination of all of the letters with the help of others, including Reich.

## O.    The Jamaica Property Lease

In May 2016, after the Audit Committee identified the Jamaica Property lease as a related-party transaction, the Company obtained an appraisal, which indicated that the Company was paying above-market rent to Personal Touch Realty LLC, the

---

[158] JX 903 at 1.

[159] Tr. 293 (Glaubach).

[160] Tr. 293 (Glaubach).

[161] Tr. 558, 562 (Reich).

entity owned fifty-fifty by Glaubach and Marx.[162] The appraisal indicated that the amount of above-market rent due on the lease was approximately $1,270,000.[163]

Marx obtained his own appraisal suggesting that the lease was below-market.[164] Nonetheless, in May 2017, Marx entered into a settlement agreement with the Company in which he agreed to provide $400,000 of consideration to the Company, consisting of $100,000 in cash and a $300,000 reduction in his share of rent that otherwise would be owed under the lease in the future.[165]

### P. Glaubach Contacts the Company's Lender

The Company has lines of credit with MidCap Financial Trust ("MidCap"), a specialty lender and the Company's primary source of credit.[166] In or around July 2016, Glaubach learned through attending Board meetings that the Company had violated certain covenants in its loan agreement with MidCap.[167] The Company was

---

[162] PTO ¶ 142. The Audit Committee also identified a related-party transaction between the Company and ABN Energy LLC, which was partly owned by Glaubach's son (Baruch Glaubach) and which allegedly charged the Company approximately $180,000 more than Con Edison from October 1, 2014 to April 9, 2016. PTO ¶¶ 144-46, 148; Tr. 116-17 (Goff). Glaubach testified that he had "nothing to do with" the deal between ABN and the Company, Tr. 291 (Glaubach), and the Company abandoned the claim. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[163] JX 717 at 166.

[164] PTO ¶ 143.

[165] JX 730 § 2(a)-(b).

[166] Tr. 15 (Goff); PTO ¶ 135.

[167] PTO ¶ 135; Tr. 416 (Glaubach).

trying to fix the defaults in order to preserve its financial relationship with MidCap.[168]

On July 6, 2016, Glaubach wrote to two executives at MidCap, stating that "I understand that Personal Touch Holding Corp. is presently seeking to renegotiate its loan."[169] Glaubach also asked in his letter whether he would be repaid $10 million that he had loaned the Company as part of the renegotiation of the Company's loan agreement with MidCap and whether his approval would be required for a new deal to be effective.[170]

On August 15, 2016, Glaubach wrote to Brett Robinson, a managing director at MidCap, reiterating that he had questions concerning the loan renegotiation and asserting that "towards the end of 2014, Personal Touch was being audited by the IRS and the NYS Department of Taxation," that "fraudulent tax returns were filed" due to mischaracterized "continuing education" reimbursements, and that that was "a major reason why I had to bring a lawsuit against them in March of 2015."[171]

Three days later, Glaubach sent a letter to Leon Black, chairman of Apollo Global Management, LLC, which manages MidCap.[172] Glaubach wrote that "I will

---

[168] PTO ¶ 137.

[169] JX 427.

[170] *Id.*

[171] JX 437.

[172] JX 439.

not sign any documents with respect to the loan because I do not know the true financial condition of the company" and "I feel they are operating at a true deficit since they are spending excessive amounts in salaries and separation packages to hush up some of their violations of the tax laws."[173]  He concluded:  "If you extend them credit, you are doing so at your own risk."[174]

At the time he sent these letters, Glaubach believed that, without credit from MidCap, the Company would be in financial jeopardy.[175]  The Company ultimately succeeded in renegotiating its line of credit with MidCap.[176]

## Q.    Glaubach Contacts Employees

On or around October 27, 2016, a sign appeared in the window of the AAA Building that stated:  "If you work for Personal Touch and would like to speak with Dr. Glaubach, please call [number deleted].  All calls will be kept strictly confidential."[177]  That same day, Dihal, Glaubach's driver, delivered letters to various administrators of the Company saying "Dr. Glaubach would like to speak to you.  Please call him at [number deleted]."[178]

---

[173] *Id.*

[174] *Id.*

[175] Tr. 415 (Glaubach); Glaubach Dep. 13-14 (Apr. 27, 2018).

[176] Tr. 511-12 (Glaubach).

[177] PTO ¶ 132.

[178] PTO ¶ 133.

In December 2016, Dihal delivered other letters to employees of the Company at a holiday party. These letters said that:

> Dr. Glaubach was unjustly removed from Personal Touch while trying to uncover fraud. He is fighting in court for the right to come back to the company he founded and was President of for over 40 years. If you have information that could help him, please call [number deleted]. All calls will be kept strictly confidential.[179]

## R. The New York Action Progresses

As of August 15, 2018, the court in the New York Action had made a number of rulings touching on some issues pertinent to the claims in this case. For example:

- The court granted Glaubach summary judgment against Slifkin on claims that Slifkin breached his fiduciary duties, wasted corporate assets, and unjustly enriched himself by directing "that misclassified income be paid to himself" and others, thus exposing the Company to tax and legal liability.[180] The court noted that Slifkin could not avoid liability for these claims "merely by producing evidence that although the payments he received were misclassified to evade taxes, he did not receive more in compensation than was his contractual due."[181]

- The court granted the Outside Directors summary judgment on Glaubach's claim that they breached their fiduciary duties by failing to promptly respond when Glaubach raised the issue of misclassified payments and thus allowing the statute of limitations to run on certain of the Company's claims.[182]

---

[179] PTO ¶ 134.

[180] *Glaubach v. Slifkin*, Index No. 702987/2015, at 5 (N.Y. Sup. Ct. July 2, 2018).

[181] *Id*. at 6.

[182] *Glaubach v. Slifkin*, Index No. 702987/2015, at 5 (N.Y. Sup. Ct. Aug. 14, 2018).

- The court denied Castiglione, DiMaggio, and two other Company employees summary judgment on the claim that they had breached their fiduciary duties, finding that the employee defendants, who had received misclassified payments, failed to show "prima facie that they committed no breach of fiduciary duty."[183]

- The court granted Balk and Slifkin summary judgment on Glaubach's claim that they engaged in a conspiracy "to induce company employees to make false accusations of sexual harassment against Glaubach for the purpose of forcing him to drop his objections to the severance package."[184]

- The court granted Marx summary judgment on Glaubach's claim that Marx breached his fiduciary duties by accepting improper payments because the "forensic accounting firm found no evidence that Marx had received any payments that had been misclassified as the reimbursement of educational expenses or that Marx had issued instructions that anyone be given misclassified payments."[185]

## II.  PROCEDURAL HISTORY

On June 24, 2015, the Company filed its original complaint in this action, which it amended on September 18, 2017 (the "Amended Complaint"). The Amended Complaint contains four claims. Count I asserts that Glaubach breached his fiduciary duties in various respects. Count II asserts a claim for unjust enrichment. Count III asserts that the Company is entitled to recover compensation paid to Glaubach under the New York faithless servant doctrine. Count IV seeks a

---

[183] *Id*. at 4.

[184] *Id*. at 8.

[185] *Glaubach v. Slifkin*, Index No. 702987/2015, at 3 (N.Y. Sup. Ct. Aug. 15, 2018).

declaration that Glaubach breached his employment agreement and was properly and validly removed as President of the Company.

On March 18, 2016, Glaubach asserted in a counterclaim that the Company breached Glaubach's employment agreement by terminating him without proper cause. Following a four-day trial held in June 2018, post-trial submissions were completed on November 15, 2018.

## III.  ANALYSIS

The parties' submissions tee up a wide-ranging mishmash of issues, which the court will address in six parts. Sections A-C address three theories the Company has advanced against Glaubach for breach of fiduciary duty concerning actions he took before he was terminated as the Company's President in June 2015, namely that Glaubach: (i) usurped a corporate opportunity by acquiring the AAA Building; (ii) engaged in self-dealing transactions; and (iii) engaged in certain disruptive and retaliatory behavior. Section D addresses the Company's request for a declaration that Glaubach was properly terminated as President for breaching his Employment Agreement and Glaubach's counterclaim for damages against the Company for breach of the same agreement. Section E addresses the Company's claim against Glaubach under the New York faithless servant doctrine. Section F addresses the aspect of the Company's breach of fiduciary duty claim against Glaubach

35

concerning certain actions he took after he was terminated as President but was still a director of the Company.

The Company did not brief and thus waived its claim for unjust enrichment.[186] Accordingly, judgment will be entered in Glaubach's favor on Count II of the Amended Complaint.

Unless otherwise indicated below, the proponent of each claim "ha[s] the burden of proving each element, including damages, of each" cause of action "by a preponderance of the evidence."[187] "[P]roof by a preponderance of the evidence means that something is more likely than not."[188]

## A. Glaubach Usurped a Corporate Opportunity by Secretly Acquiring the AAA Building for Himself

The Company contends that Glaubach breached his fiduciary duty of loyalty by usurping the corporate opportunity of acquiring the AAA Building for himself. I agree for the reasons explained below.

Eighty years ago, in its seminal decision of *Guth v. Loft, Inc.*, our Supreme Court described the corporate opportunity doctrine as follows:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of

---

[186] *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[187] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018) (citation and internal quotation marks omitted).

[188] *Id.*

practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.[189]

The high court explained that the question of whether a usurpation of a corporate opportunity has occurred "is not one to be decided on narrow or technical grounds, but upon broad considerations of corporate duty and loyalty."[190] The corporate opportunity doctrine is therefore rightly considered "a subspecies of the fiduciary duty of loyalty."[191] That "duty has been consistently defined as 'broad and encompassing,' demanding of a director 'the most scrupulous observance.'"[192]

In *Broz v. Cellular Information Systems, Inc.*, our Supreme Court more recently explained that:

> The corporate opportunity doctrine, as delineated by *Guth* and its progeny, holds that a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[193]

---

[189] 5 A.2d 503, 511 (Del. 1939).

[190] *Id.*

[191] Eric Talley, *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine*, 108 Yale L.J. 277, 279 (1998).

[192] *BelCom, Inc. v. Robb*, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[193] 673 A.2d 148, 154-55 (Del. 1996).

Although these four factors are articulated in the conjunctive, the Supreme Court in *Broz* emphasized "that the tests enunciated in *Guth* and subsequent cases provide guidelines to be considered by a reviewing court in balancing the equities of an individual case" and that "[n]o one factor is dispositive and all factors must be taken into account insofar as they are applicable."[194]  Consistent with this approach, the Supreme Court previously referred to the "line of business" and "interest or expectancy" factors in the disjunctive, suggesting that proof of either factor could sustain a corporate opportunity claim,[195] and this court has decided the viability of corporate opportunity claims by weighing the four *Broz* factors in a holistic fashion.[196]  With the above principles in mind, the court next considers each of the *Broz* factors based on the trial record.

---

[194] *Id.* at 155.

[195] *Equity Corp. v. Milton*, 221 A.2d 494, 497 (Del. 1966) ("[W]hen there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, *or* is an opportunity in which the corporation has an actual or expectant interest, the officer . . . may not take the opportunity for himself.") (emphasis added).

[196] *See Beam v. Stewart*, 833 A.2d 961, 975 (Del. Ch. 2003) (finding that stockholder failed to state a claim for usurpation of a corporate opportunity based "[o]n balancing the four factors" enumerated in *Broz*), *aff'd*, 845 A.2d 1040 (Del. 2004); *Kohls v. Duthie*, 791 A.2d 772, 784 (Del. Ch. 2000) (finding that stockholders stated a corporate opportunity claim where corporation had an expectancy in repurchasing a block of its stock for a nominal price even though the opportunity was not in the corporation's line of business).

## 1. The Company Was Financially Able to Acquire the AAA Building

Although Delaware courts have not delineated a clear standard for determining whether a corporation is financially able to avail itself of a corporate opportunity, our Supreme Court has opined (albeit in dictum) that this court may consider "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard."[197] Since then, this court has applied various standards, "including the 'insolvency-in-fact' test, as well as considering whether the corporation is in a position to commit capital, notwithstanding the fact that the corporation is actually solvent."[198]

Glaubach purchased the AAA Building for $1.8 million in February 2015 and gave AAA six months of free rent as part of the transaction. This equates, at most, to an acquisition price of approximately $2.4 million, as discussed below.[199] Applying any reasonable standard of financial ability, I am convinced that the

---

[197] *Yiannatsis v. Stephanis by Sterianou*, 653 A.2d 275, 279 n.2 (Del. 1995) (declining to adopt "insolvency-in-fact" test where "the question of what test should be used to determine financial inability is not presently before the Court").

[198] *In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *9 (Del. Ch. July 28, 2016) (citation omitted).

[199] *See infra* Section III.A.5.

Company was financially able to acquire the AAA Building in this price range during the time period when purchase discussions were occurring with AAA.

Marx and Goff (an Outside Director) both testified that they believed the Company could afford to purchase the AAA Building, with Goff explaining that Slifkin, the Company's CEO at the time, reported at a February 2015 Board meeting that the Company "could easily finance the acquisition of the AAA Building."[200] Their views are substantiated by evidence that the Company generated well over $300 million in revenues and earned approximately $15 million in EBITDAE in 2014, had cash on hand of approximately $30.4 million as of December 31, 2014, and that its annualized EBITDAE for "2015 and beyond" was expected as of April 2015 to increase from approximately $15 million to approximately $20 million after a planned acquisition.[201] On the other side of the ledger, the record is devoid of any evidence indicating that the Company's financial position was precarious when the AAA Building was purchased, and Glaubach offered no evidence suggesting that the Company was not financially able to purchase it for what he paid.

---

[200] Tr. 100-01 (Goff); Tr. 628 (Marx).

[201] Tr. 9 (Goff) (as of July 2014, the Company's approximate revenues were about $320 million); JX 281 at 4 (estimating 2014 revenues and EBITDAE at approximately $372.5 million and $11.6 million, respectively); JX 309 at 3 (reporting that 2014 EBITDAE was 22% higher than previously projected); *id.* at 4 (noting that the Company's cash as of December 31, 2014 was approximately $30.4 million and that its "current annualized EBITDAE" was approximately $15 million).

## 2. The Company Had a Clear Interest and Expectancy in Acquiring the AAA Building

With respect to the third *Broz* factor, I find that the Company clearly had an interest and expectancy in acquiring the AAA Building. It is stipulated that the Company "had been seeking additional office space in the Jamaica, New York area for years and was particularly interested in the AAA Building because it was located next door to the offices of one of the Company's key operating subsidiaries" and "could be used to relocate the Company's corporate offices, for expansion of the Company's Jamaica operations, as offices for the Company's other subsidiaries and for storage."[202]

The Company's general interest in acquiring the AAA Building became an actual opportunity in March 2013, when Slifkin learned that the AAA Building was for sale.[203] On March 4, 2013, Slifkin reported this news to Marx and Glaubach in an email, explaining that the "asking price seems reasonable" and discussing several ways the Company could use the property.[204] Two days later, Marx and Glaubach met with Clifford of AAA to inspect the building and negotiate a price for the

---

[202] PTO ¶¶ 105-06.

[203] JX 48.

[204] PTO ¶ 104; JX 48. Glaubach makes no argument that the opportunity to acquire the AAA Building came to him in an individual rather than corporate capacity, nor could he. The Slifkin email was a corporate communication from the Company's CEO using his corporate email address that focused on potential uses for the property that would benefit the Company. *See id.*

41

Company to purchase it.[205] Glaubach understood at the time that it was the Company that was the intended purchaser of the building.[206] Marx's negotiations with Clifford stalled not because the Company lost interest in the property, but because AAA's plans to move to a different location fell through for a time.[207] Clifford reassured Marx, however, that "we want to move and we'll call you as soon as we have anything."[208]

While the Company was waiting to hear back from AAA, Glaubach stepped in to take the opportunity for himself by instructing his assistant (Reich) to contact Clifford to see whether AAA was ready to sell the building.[209] Tellingly, when Reich and Clifford were engaged in discussions during the summer of 2014, they were both under the impression that the Company was to be the purchaser of the building.[210] And when Reich learned later that Glaubach wanted the building for himself, he took steps at Glaubach's direction to conceal his negotiations with AAA from others at the Company.[211]

---

[205] PTO ¶¶ 108-11.

[206] *See* JX 333 (letter from Glaubach to Marx stating: "*The Company* was unwilling to meet the prior owner's terms of sale . . . .") (emphasis added).

[207] Tr. 626 (Marx).

[208] Tr. 627 (Marx).

[209] PTO ¶ 112.

[210] PTO ¶ 113.

[211] *See* Tr. 400, 403, 407 (Glaubach); Tr. 589-90 (Reich).

42

The Company's interest in acquiring the AAA Building continued right up to the time Glaubach closed on his own purchase. As Goff testified, Marx updated the Board about "conversations that he had ongoing with the owners of the AAA Building" at a Board meeting on February 10, 2015—the day before Glaubach closed on the property.[212]

Glaubach's assertion that the Company lost interest in acquiring the AAA Building is not supported by the record. To the contrary, after Marx initiated a dialogue with AAA to acquire the building, AAA's representative expressly told him that he would contact Marx when AAA was ready to move forward. Glaubach used that opening to hijack the negotiations for his own benefit while concealing from AAA that he was acting on his own behalf (instead of the Company's) and while concealing from the Board his interactions with AAA up to the very end, including at the February 2015 Board meeting. In sum, the record clearly supports the conclusion that the Company was keenly interested in, and had a reasonable expectation of, acquiring the AAA Building at all relevant times.

### 3. The Line of Business Inquiry

The second *Broz* factor asks whether the opportunity to acquire the AAA Building was within Personal Touch's line of business. Noting that the Company historically had leased office space and that it had owned a piece of real estate only

---

[212] Tr. 100-01 (Goff).

once before, Glaubach argues that owning real estate is not in the Company's line of business.[213]   Quoting the Company's own brief, Glaubach contends that the Company's "two main *lines of business*" consist of "(i) a managed long-term healthcare program that provides home-based services to patients who would otherwise be in nursing homes; and (ii) a more traditional home care operation, which is in seven states and provides home healthcare aides, nurses, physical therapy and other home-based healthcare services."[214]

The Company counters that the Company's past practice of leasing office space, including from Marx and/or Glaubach,[215] rather than owning it does not matter because the "line of business" inquiry should be construed broadly based "on the current needs of the Company, not on past practices."[216]   According to Personal Touch, "the Company had significantly changed following the ESOP transaction, because it was no longer controlled by Marx and Glaubach alone."[217]

Consistent with its doctrinal moorings in the duty of loyalty, the "line of business" concept was intended to be applied flexibly.  In *Guth*, the Supreme Court stated that "[t]he phrase is not within the field of precise definition, nor is it one that

---

[213] Def.'s Opening Br. 38-39 (Dkt. 133).

[214] *Id.* at 38 (quoting Pl.'s Opening Br. 3 (Dkt. 127)).

[215] *See* Tr. 114 (Goff); Tr. 284 (Glaubach); JX 360 at 4-6.

[216] Pl.'s Reply Br. 13 (Dkt. 135).

[217] *Id.* at 12-13.

can be bounded by a set formula."[218]  Rather, "[i]t has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case," and "latitude should be allowed for development and expansion."[219] Delaware courts accordingly have "broadly interpreted" the "nature of the corporation's business" when "determining whether a corporation has an interest in a line of business."[220]

In my opinion, Glaubach takes a crabbed view of the line of business inquiry that misses the central point of the corporate opportunity doctrine.  Although the record bears out that the Company historically did not purchase real estate to house its operations, the Company has never been engaged in the business of purchasing and leasing real estate.  Personal Touch is a healthcare provider, not a commercial real estate venture.  Applying the line of business concept flexibly, the sensible way to consider the issue in the context of this case is that, irrespective of its past practice of leasing office space, the Company was presented with a rare opportunity to acquire a building with a highly desirable location that it could use to relocate or

---

[218] *Guth*, 5 A.2d at 514.

[219] *Id.*

[220] *Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012); *see also Riverstone*, 2016 WL 4045411, at *10 ("[T]he nature of the corporation's business should be interpreted broadly, giving latitude to the corporation for development and expansion.").

45

expand its healthcare operations. In that sense, the opportunity to acquire the AAA Building fit within the Company's existing line of business.

An equally sensible way to consider the issue is that the line of business test is simply not relevant here, where (i) the Company had a clear interest and expectancy in acquiring the AAA Building for the reasons explained previously, and (ii) the opportunity presented concerns an operational decision about how to manage or expand an existing business—*i.e.*, whether it is better to buy or lease office space—as opposed to the opportunity to acquire a new business.[221] Vice Chancellor Lamb's decision in *Kohls v. Duthie*[222] exemplifies this approach.

In *Kohls*, the court found that stockholders of Kenetech Corporation stated a derivative claim for usurpation of a corporate opportunity where one of the corporation's directors purchased a block of the corporation's stock from its largest stockholder for a nominal price.[223] The court noted that "because corporate opportunity cases arise in widely varying factual contexts, '[h]ard and fast rules are not easily crafted to deal with such an array of complex situations.'"[224] The court

---

[221] *See* R. Franklin Balotti & Jesse A. Finkelstein, 2 *The Delaware Law of Corporations and Business Organizations* § 4.16[C], at 4-154 (3d ed. 2018 Supp.) ("Where the opportunity does not involve the corporation's existing business operations, the 'line of business' test is not applicable.")

[222] 791 A.2d 772 (Del. Ch. 2000).

[223] *Id.* at 786-87.

[224] *Id.* at 784 (quoting *Broz*, 673 A.2d at 155).

then rejected the argument that the offer to purchase the stock "did not constitute an opportunity in the company's line of business" given that the corporation "did not have in place any policy or plan for repurchasing its stock" and "had no share repurchase program in effect."[225]  It was sufficient, the court concluded, that the corporation logically would have an "expectancy in being presented with an opportunity to repurchase a large block of its own stock for little or no consideration."[226]

I agree with this reasoning.  Even if the opportunity to acquire the AAA Building could be said not to fall within the Company's existing line of business under a strict interpretation of that concept, that is not fatal to the Company's claim. To the contrary, it is sufficient that the Company had a clear interest and expectancy in the property at the time the opportunity to acquire it arose.

### 4. Glaubach Acted Inimicably to His Fiduciary Duties

The fourth *Broz* factor prohibits a corporate officer or director from taking an opportunity for his own if "the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation."[227]  Elaborating on this factor, the Supreme Court explained that "the corporate opportunity doctrine is implicated

---

[225] *Id.*

[226] *Id.*

[227] *Broz*, 673 A.2d at 155.

only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity."[228]  That is what occurred here.

After learning about the opportunity to purchase the AAA Building from Slifkin, Glaubach attended the initial meeting with Marx and Clifford in March 2013 and knew full well that the Company was interested in purchasing it.  Putting his self-interest above his duty of loyalty to Personal Touch, Glaubach chose to compete directly with the Company to acquire for himself an admittedly "vital property" while making concerted efforts to conceal his activities from the Company until after he had closed on the deal.[229]  Indeed, Glaubach did not disclose to his fellow directors his efforts to buy the building for himself even when Marx was updating the Board about his efforts to purchase the property for the Company in Glaubach's presence.[230]

Removing any doubt about the importance of the building to the Company and the conflicted nature of what Glaubach did, Glaubach sought to lease the building to the Company almost immediately after he purchased it.[231]  In short, Glaubach was acutely aware of the value the opportunity to acquire the AAA

---

[228] *Id.* at 157.

[229] PTO ¶¶ 114, 116; Tr. 400 (Glaubach).

[230] Tr. 100 (Goff); *see also* PTO ¶ 84; JX 274.

[231] Tr. 101 (Goff); PTO ¶ 100; JX 326.

Building presented to the Company because of the building's unique location and, instead of looking out for the interests of Personal Touch, he secretly thwarted its ability to take advantage of that opportunity so that he could profit personally by acquiring the building for himself.

Finally, I reject Glaubach's contention that he "did not place himself in a position 'inimical' to his corporate duties by purchasing the building" based on Section 2.2 of his Employment Agreement.[232] That provision states simply that "[t]he Company acknowledges that [Glaubach] has business interests outside of the Company and will continue to devote a material portion of his business time, attention and affairs to such other business interests."[233] Nothing in this provision allows Glaubach to compete with the Company for opportunities in which it has an interest or expectancy. Indeed, the preceding sentence in Section 2.2 states that Glaubach "shall not engage, directly or indirectly, in any other business, employment or occupation which is competitive with the business of the Company."[234]

\* \* \* \* \*

---

[232] Def.'s Opening Br. 41.

[233] JX 27 § 2.2.

[234] *Id.*

For the reasons explained above, balancing each of the *Broz* factors and considering them in a holistic fashion, the court concludes that Glaubach breached his fiduciary duty of loyalty by usurping the opportunity to purchase the AAA Building. I turn next to determining the damages resulting from this breach.

### 5.     Damages for the AAA Building

In *Guth*, our Supreme Court explained that "[i]f an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit."[235]  Applying this principle, this court has awarded lost profits as a measure of damages for usurpation of ongoing business opportunities.[236]  More generally, Chancellor Allen once summarized basic principles for awarding damages as follows:

> The law does not require certainty in the award of damages where a wrong has been proven and injury established.  Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.  Speculation is an insufficient basis, however.  Each situation must be evaluated to know whether justice will permit an estimation of damages given the testimonial record or whether the record affords insufficient basis to fix an award.[237]

---

[235] 5 A.2d at 510.

[236] *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *23-28 (Del. Ch. Jan. 25, 2013); *Dweck*, 2012 WL 161590, at *17-18.

[237] *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992, revised Oct. 6, 1992).

Here, the opportunity Glaubach usurped was not an ongoing operating business but the opportunity to acquire a building at an attractive price that the Company could have used to relocate and/or expand its operations with the potential for the property to appreciate in value. The Company contends an appropriate measure of damages is the increase in value of the building from February 2015, when Glaubach acquired it, to the date of trial. In response, Glaubach appears to suggest that no damages may be awarded until such time, if ever, that Glaubach actually sells the AAA Building and realizes a profit on it.[238] I reject Glaubach's argument, for which no legal support is provided and which would lead to the inequitable result of affording the Company no remedy for Glaubach's breach of duty. In my view, the Company has advanced a logical theory for quantifying damages that can be reasonably estimated based on record evidence.

Specifically, the Company offered the expert opinion of Matthew J. Guzowski, a professional appraiser, who credibly testified that the value of the AAA Building as of the time of trial was $4.5 million based on a "market valuation."[239] Glaubach offered no expert testimony of his own concerning the value of the AAA Building. I thus use the unrebutted figure of $4.5 million to which Guzowski opined as the current value of the AAA Building.

---

[238] *See* Def.'s Opening Br. 52-53; Post-Trial Tr. 99 (Dkt. 142).

[239] Tr. 803-07 (Guzowski); JX 717 at 3, 89.

The Company seeks $2.7 million in damages as compensation for Glaubach's usurpation of the opportunity to purchase the AAA Building. That amount reflects the difference between its current value ($4.5 million) and the amount of cash Glaubach paid to acquire it ($1.8 million). This calculation, however, overstates the amount of damages somewhat because it fails to account for the fact that Glaubach provided AAA with six months of free rent as part of the deal.

The record does not contain evidence of the rental value of the AAA Building at the time in question. But the record does show that AAA "wanted $2.4 million" for the building and only accepted Glaubach's offer of $1.8 million after he added six months of free rent.[240] To be conservative in determining damages, I assume that the difference of $600,000 represents a reasonable estimate of six months of rent for the building. Using this figure, the amount of damages the court will award Personal Touch for its corporate opportunity claim is $2.1 million, which reflects the difference between the AAA Building's current value ($4.5 million) and Glaubach's estimated acquisition price ($1.8 million + $600,000 = $2.4 million).

## B. The Alleged Self-Dealing Transactions

The Company asserts that Glaubach breached his fiduciary duties by engaging in "self-dealing" transactions that fall into four categories: (i) the provision of

---

[240] Tr. 278 (Glaubach).

$422,000 worth of healthcare services to his sister-in-law, Giza Shechtman; (ii) the issuance of a $133,177 check to Shechtman; (iii) entering into the Jamaica Property lease; and (iv) his use of an assistant (Reich) and a driver (Dihal).

"Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."[241] In other words, in a typical self-dealing transaction, the fiduciary is *the recipient* of an allegedly improper personal benefit, which usually comes in the form of obtaining something of value or eliminating a liability. With this framework in mind, the court addresses next the Company's four categories of self-dealing claims.

### 1. Glaubach Did Not Engage in Self-Dealing with Respect to the Healthcare Services Provided to Shechtman

The Company seeks to hold Glaubach personally liable for $422,000 in damages for healthcare services provided to Shechtman over a three-year period before the filing of this action (*i.e.*, from June 25, 2012 to June 25, 2015) on the theory that the provision of these services constituted self-dealing by Glaubach.[242] It is a strange theory because Glaubach was not the recipient of any of these healthcare services and there is no evidence that Glaubach had a legal obligation to

---

[241] *Cede & Co.*, 634 A.2d at 362.

[242] Pl.'s Opening Br. 50, 58.

pay for them. Shechtman was the beneficiary of the services, and the Company apparently never made any effort to collect the $422,000 in question from her. In support of this "self-dealing" claim against Glaubach, the Company advances essentially two arguments, neither of which has merit.

First, citing *Chaffin v. GNI Group, Inc.*,[243] the Company contends that "[u]nder Delaware law, a fiduciary may be deemed self-interested if a family member benefits from a transaction."[244] In *Chaffin*, the court denied a motion to dismiss a stockholder challenge to a merger transaction because it "was not approved by a majority of independent directors" and thus would not be protected under the business judgment standard.[245] The Company relies on the court's finding that one of the directors who approved the merger—who had a son who stood to receive "economic and career benefits" from the transaction—"must . . . be deemed interested" because "[i]nherent in the parental relationship is the parent's natural desire to help his or her child succeed."[246] *Chaffin* is readily distinguishable. It did not concern self-dealing by a corporate fiduciary. The court merely considered

---

[243] 1999 WL 721569 (Del. Ch. Sept. 3, 1999).

[244] Pl.'s Reply Br. 18.

[245] 1999 WL 721569, at *6.

[246] *Id.* at *5.

whether board approval of the challenged transaction was sufficiently disinterested and independent to warrant business judgment review.[247]

Second, the Company contends it "demonstrated that Glaubach—through threats and inside dealing—prevented the Company from billing Schechtman [*sic*] for the services she received."[248] This argument fails because, even if this factual contention were true, the Company has not shown that Glaubach engaged in self-dealing. To repeat, Glaubach was not the recipient of any of the healthcare services at issue and had no legal obligation to pay for them. The Company has not identified any authority where a corporate fiduciary has been found liable for *self-dealing* for a benefit he did not receive personally. In the absence of such authority, I decline to hold Glaubach personally liable for the cost of healthcare services that Shechtman received under a theory of self-dealing.

In the interest of completeness, I note that although the Company did not challenge Glaubach's conduct with respect to Shechtman's healthcare services as an act of bad faith, the evidence would not support such a theory in any event. The Company's case for finding Glaubach personally liable for $422,000 in healthcare

---

[247] The Company also relies on a statement in *Grimes v. Donald*, that a basis for demand excusal "would normally be that . . . a majority of the board has a material financial or familial interest." 673 A.2d 1207, 1216 (Del. 1996). This citation is of no aid to the Company. Like the court in *Chaffin*, *Grimes* did not find self-dealing by a corporate fiduciary; the high court merely mentioned the word "familial" without any analysis.

[248] Pl.'s Reply Br. 18.

services provided during the three-year period ending in June 2015 consists of testimony from Glaubach and Susan Miano.[249] But neither person's cited testimony would support a finding of bad faith conduct relating to the healthcare services Shechtman received during the relevant period.

With respect to Glaubach, the cited testimony shows that Glaubach sent a letter to JoAnn Piervinanzi, the Company's Director of Reimbursement, threatening to hold her "fully responsible" for terminating Shechtman's healthcare services if "something untoward happens to her as a result of the cessation of services."[250] That letter was written, however, in September 2016 and pertained to a bill for services rendered to Shechtman "since July 1, 2015"—after the period relevant to the Company's claim for $422,000 in damages.[251]

The cited testimony of Miano is equally if not more unhelpful to the Company. Miano is a partner at Friedman LLP, the accounting firm that performed a forensic analysis of the healthcare services the Company provided to Shechtman from January 2010 to June 2014.[252] She testified that Friedman LLP found that

---

[249] *Id.*

[250] JX 733; Tr. 437-41 (Glaubach).

[251] JX 733. The questioning of Glaubach leading up to the discussion of this letter is too imprecise and ambiguous to allow the court to find that Glaubach made any threats pertaining to healthcare services provided to Shechtman before July 2015. *See* Tr. 437-39 (Glaubach).

[252] Tr. 743, 746-50 (Miano); JX 347.

"there was a systematic suppression of invoicing to Giza Shechtman" but, despite being asked the same question twice, she did not testify that Glaubach was responsible for it.[253]  Nor could she credibly do so.  Friedman LLP's report never mentions Glaubach and actually explains that not billing Shechtman was a standard practice that apparently was approved by Slifkin:

> The testing of the samples of transactions we selected revealed that 1) the health care providers were paid by the Company for their time rendered to Ms. Schectman [*sic*] as indicated on the Patient Activity Reports; 2) invoices were generated, but none of them were actually sent to Ms. Schectman [*sic*] for payment; and 3) revenue and accounts receivable were recorded to the [Personal Touch] general ledger for the services rendered to Ms. Schectman [*sic*] but were subsequently reversed and not reflected in the Personal-Touch Home Care and Affiliates Audited Combined Financial Statements as of, and for the years ended, December 31, 2010 through 2014.  Based on interviews with various [Personal Touch] accounting and billing department personnel . . . Friedman understands that *these are standard practices that have been historically conducted at the Company for many years*.  While Friedman has seen no written documentation indicating any approval of the reversal of the revenue and accounts receivable, Joann Piervinanzi, Director of Reimbursement, and Tom McNulty, A/R Manager, indicated that they believe the practices *were initially approved by David Slifkin* prior to the start of their employment with the Company.[254]

The fact that Friedman LLP attributed the Company's failure to bill Shechtman to Slifkin is not surprising because the Services Agreement that

---

[253] Tr. 753 (Miano); *see* Tr. 750-51 (Miano).

[254] JX 347 at 2 (emphasis added).  The Friedman report further explained that this standard practice dated back to at least 2000 according to Piervinanzi.  *Id.* at 4.

57

Glaubach, Marx, and Shechtman signed in 2001 designated Slifkin as "the sole arbiter" in "the event of a dispute as to the amount of [her] entitlement."[255] As explained previously, the Services Agreement also provided that the cost of services provided to Shechtman would be netted against distributions to which she was entitled.[256] Significantly, the Company's damages calculation of $422,000 does not take into account whatever distributions Shechtman was entitled to receive during the period in question, which undermines its reliability. In any event, for the reasons explained above, the court concludes that Glaubach did not engage in self-dealing with respect to healthcare services Shechtman received from the Company.

### 2. Glaubach Did Not Engage in Self-Dealing with Respect to the $133,177 Payment to Shechtman

The Company next seeks to hold Glaubach personally liable for a payment it made to Shechtman in July 2013. According to the Company, Glaubach "caused the Company to issue a $133,177 check to Schectman [*sic*] because he claims she was shortchanged as part of the ESOP transaction."[257] This would be improper, the Company contends, because it would mean that Shechtman was shortchanged not

---

[255] JX 8. The Company offered no evidence suggesting that the Services Agreement was no longer effective during the relevant period and, to the contrary, acted at trial as if it was. *See* Post-Trial Tr. 58.

[256] *See supra* Section I.B; *see also* Tr. 635 (Marx) (testifying that, under the Services Agreement, "Shechtman herself will pay for her own services providing we pay five percent of all the operations in the metropolitan area").

[257] Pl.'s Opening Br. 50-51.

by the Company, but "by the participants in the ESOP transaction, including Dr. Glaubach himself."[258]

There is some confusion in the record about the reason for this payment. Goff suggested the payment "related to the ESOP" transaction based on Glaubach's "J'accuse" letter.[259] But that letter does not connect the check in question to the ESOP transaction. The letter just states, without referring to the ESOP transaction, that an accountant for the Company (Reimer) informed Glaubach that Shechtman "was shortchanged close to $200,000.00 in distributions."[260] When the court asked Glaubach about the check, he explained emphatically that the payment "had nothing to do with the ESOP transaction," and that it was made to compensate Shechtman for an equity distribution that, according to the Company's advisors, she should have received from the Company before the ESOP transaction.[261] I credit this testimony and thus find that the $133,177 payment to Shechtman was not a self-dealing transaction and that the Company otherwise has failed to prove that Glaubach should be held liable for it.[262]

---

[258] Tr. 300; *see* Tr. 299-300 (colloquy with Company counsel).

[259] Tr. 105 (Goff).

[260] JX 180 at 2.

[261] Tr. 446-48 (Glaubach).

[262] The Company suggests that it was Glaubach's burden to prove that he was entitled to have the check issued to Shechtman based on a self-dealing theory that would trigger entire

59

### 3. Glaubach Is Liable for his Portion of the Above-Market Rent on the Jamaica Property Lease

The Company seeks to hold Glaubach liable for $635,000 in damages representing his share of the above-market rent that was charged for a five-year lease on the Jamaica Property. Unlike the transactions involving Shechtman, the Jamaica Property lease is a classic example of self-dealing because Glaubach and Marx, both fiduciaries of Personal Touch at the time, stood "on both sides" of the transaction. On one side, Glaubach signed the lease on behalf of an affiliate of Personal Touch.[263] On the other side, Marx signed the lease on behalf of the owner of the Jamaica Property, Personal Touch Realty LLC, an entity that Marx and Glaubach co-owned on a fifty-fifty basis.[264]

Glaubach argues he should be exempt from liability for the Jamaica Property lease because Marx was the one who set the rental rate in the lease.[265] The record bears this out, but it is no defense to liability for self-dealing "[b]ecause under the traditional operation of the entire fairness standard, the self-dealing director would

---

fairness review. Pl.'s Reply Br. 19. I disagree. Because the transaction was not an act of self-dealing for the reasons explained above, it does not trigger entire fairness review.

[263] JX 58 at 5.

[264] *Id.*; PTO ¶ 140.

[265] Tr. 279 (Glaubach).

have breached his duty of loyalty if the transaction was unfair, regardless of whether he acted in subjective good faith."[266]

With respect to the measure of damages, Guzowski credibly opined that the rental term of the Jamaica Property lease was $1,270,000 above market based on an analysis of comparable rental rates (on a per-rentable-square-foot basis) over the five-year period of the lease.[267] Glaubach did not submit any expert opinion (or even lay testimony) to counter Guzowski's opinion. The court thus credits Guzowski's testimony and enters judgment for $635,000 in damages against Glaubach and in the Company's favor for his share of liability for the above-market rent the Company was charged under the Jamaica Property lease.

#### 4. The Company Acquiesced to Glaubach's Personal Use of Employees Reich and Dihal

The Company's final theory of "self-dealing" seeks damages from Glaubach for the salaries it paid to two employees who assisted Glaubach: (i) $209,439.60 that was paid to David Reich during his tenure as a Company employee for approximately sixteen months from January 2014 to April 2015; and (ii) $147,000 (or $49,000 per year) that was paid to Sase Dihal, Glaubach's driver, for the three-

---

[266] *Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008) (Strine, V.C.).

[267] Tr. 809-11(Guzowski); JX 717 at 99, 166. Guzowski's report was the same one that was used in connection with the Company's negotiation of a settlement with Marx for his share of the above-market rent. *See supra* Section I.O.

year period before this action was filed.[268] This is yet another odd theory of self-dealing for which the Company cites no supporting legal authority.

Glaubach argues that "[t]he Company had knowledge of and consented to, or acquiesced in," the employment of Reich and Dihal.[269] In response to this defense, the Company makes no comment about Dihal and, with respect to Reich, says only that it "was left in the dark regarding Reich's efforts to purchase the AAA Building for Glaubach."[270] On this point, however, the record is undisputed that Glaubach personally paid Reich $25,000 for the work he performed concerning Glaubach's purchase of the AAA Building.[271]

"A claimant is deemed to have acquiesced in a complained-of act where he: has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."[272] In my view, the Company acquiesced to its employment of both Reich and Dihal.

---

[268] Pl.'s Opening Br. 59-60; PTO ¶ 119.

[269] Def.'s Opening Br. 44.

[270] Pl.'s Reply Br. 21.

[271] Tr. 531-32 (Reich); Reich Dep. 54-58 (Sept. 18, 2017); Glaubach Dep. 144 (July 28, 2017).

[272] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014).

With respect to Reich, it is beyond dispute that the Company was fully aware of the nature of his employment by the Company. Reich had an official title (Assistant to the President), a Company email address, and he met with Slifkin "[e]arly on" to discuss some initial tasks he would perform for the Company.[273] He regularly attended Board meetings as Assistant to the President,[274] and he directly corresponded with Slifkin and Hold-Weiss about tasks he was working on for them.[275] The Company had full knowledge about Reich's activities, yet there is no evidence that anyone at the Company took issue with Reich's work or disputed the propriety of the Company paying his salary to assist Glaubach as the Company's President at any point during the time he worked for the Company. Indeed, Reich's employment was terminated only after Glaubach had been suspended from his duties as President, obviating the need for an assistant for that position.[276]

With respect to Dihal, Glaubach testified that he and Marx agreed around the time of the ESOP transaction that the Company would provide him with a driver—just as it had provided Marx with a secretary for over thirty years for "private work."[277] Marx did not testify otherwise and the Company does not suggest it was

---

[273] Tr. 530-31 (Reich); *see* JX 63; JX 70; JX 77.

[274] *See, e.g.*, JX 68; JX 74; JX 104.

[275] JX 70; JX 77.

[276] Tr. 539-40 (Reich).

[277] Tr. 287-88 (Glaubach); Glaubach Dep. 458-60 (Sept. 6, 2017).

unaware that it was paying Dihal to serve as Glaubach's driver. The Company's grievance with paying Dihal boils down to "the fact that [Glaubach] is not entitled to [a driver] under his Employment Agreement."[278] But nothing in that agreement prohibits the Company from paying for a driver for Glaubach.[279]

In sum, the record shows that the Company was fully aware of the services Reich and Dihal were providing to Glaubach during the time period in question and did nothing to question or object to paying their salaries until the Company's relationship with Glaubach ruptured in June 2015 when it initiated this lawsuit. This constitutes acquiescence. Accordingly, the Company's request to recoup from Glaubach the salaries it paid to Reich and Dihal lacks merit.

## C. The Company Has Failed to Prove that Glaubach Acted in Bad Faith Before his Termination as President of the Company

The Company next advances the novel argument that Glaubach breached his fiduciary duties by conducting a "campaign of harassment" against fellow Board members and employees of the Company.[280] In this section, the court considers that argument with respect to events that occurred before Glaubach was terminated as

---

[278] Pl.'s Opening Br. 51.

[279] *See* JX 26. The Employment Agreement does entitle Glaubach to "full-time use of a Company automobile" but, to repeat, nothing in that provision or elsewhere in the Employment Agreement prohibits Glaubach from receiving the services of a driver. *See id.* § 3.4.

[280] Pl.'s Opening Br. 46.

President of the Company in June 2015, which can be analyzed in two parts: (i) Glaubach's interactions with other Board members; and (ii) his alleged retaliation against three employees who made complaints about sexual harassment against Glaubach (the "Complainants").

The Company acknowledges that "[l]imited case law exists in the corporate context relating to harassing conduct because (in most cases) this type of behavior is often dealt with in the criminal courts as harassment or witness tampering."[281] The Company then relies on several cases for support, but they are inapposite. They either involved situations where this court sanctioned a party for compromising the integrity of a judicial proceeding[282] or where the fiduciary's conduct was motivated by a desire to procure financial or other benefits to the detriment of the corporation.[283] Neither scenario is present here. I thus turn to first principles to analyze this claim.

---

[281] *Id.*

[282] *See OptimisCorp v. Waite*, 2015 WL 5147038, at *2 (Del. Ch. Aug. 26, 2015) (court imposed sanctions against plaintiffs after concluding they had "threatened the integrity of this proceeding" based on findings that they "paid witnesses for the content of their testimony, threatened witnesses with criminal charges, attempted to open criminal investigations, and generally engaged in threats of civil litigation based on questionable or baseless claims, all in an effort to secure 'evidence' that would aid the plaintiffs in this case").

[283] *See CSH Theatres, L.L.C. v. Nederlander of S.F. Assocs.* 2018 WL 3646817, at *27 (Del. Ch. July 31, 2018) (finding that defendant breached her duty of loyalty and "placed her own interests above those of the Company" by refusing to approve a project unless her co-president "agreed to modify the LLC Agreement to give her more control" and by "us[ing] her fiduciary position to prevent the Company from pursuing shows she wanted

"Directors of a Delaware corporation owe two fiduciary duties—care and loyalty."[284] Broadly speaking, "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[285] "The duty of loyalty includes a requirement to act in good faith . . . ."[286] "To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."[287] "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."[288] With these principles in mind, I turn to the two categories of alleged harassment.

With respect to Glaubach's interactions with Board members, the Company focuses on a single meeting that occurred on April 29, 2015. Although Glaubach

---

for her competing business"); *BelCom, Inc. v. Robb*, 1998 WL 229527, at *1 (Del. Ch. Apr. 28, 1998) (finding that defendant "breached the duty of loyalty that he owed to [the corporation] by trying to extract millions of dollars from BelCom, Inc., based on frivolous invoices submitted by defendant and coupled with a dedicated campaign designed to harass and publicly embarrass BelCom and its affiliates, as well as individuals associated with these entities").

[284] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 32 (Del. Ch. 2014).

[285] *Cede & Co.*, 634 A.2d at 361.

[286] *Orchard*, 88 A.3d at 32.

[287] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[288] *Walt Disney*, 906 A.2d at 67.

engaged in inflammatory name-calling and was aggressive with his fellow directors at that meeting,[289] I find that his actions were not motivated by an intention to procure benefits for himself at the expense of the Company or to otherwise harm the Company so as to constitute bad faith. To the contrary, the weight of the evidence suggests that Glaubach's behavior, although uncivil, was motivated by a genuinely held belief on his part that Personal Touch was being mismanaged and a sense of frustration that his fellow directors were ignoring concerns he had been expressing to them for many months about the Company's management.[290]

The allegations of retaliation arose out of an investigation into whether Glaubach sexually harassed three employees of the Company. The Company retained outside counsel (Klein Zelman) to investigate that matter. The investigation began on September 30, 2014, and is summarized in a November 21, 2014 report, which was supplemented on December 4, 2014.[291]

The record evidence of retaliation is limited. Neither DiMaggio nor Hold-Weiss testified at trial, and the Company does not rely on their deposition testimony. Vargas is the only one of the three Complainants who testified at trial. She credibly

---

[289] *See supra* Section I.K.

[290] Tr. 247-52, 264-65 (Glaubach) (testifying about Board's failure to respond to concerns he expressed in letters he sent to directors in July and October 2014).

[291] *See* JX 195; JX 232. Glaubach objects to the admissibility of these reports on hearsay grounds. That objection is sustained, except with respect to the portions of the reports that were included in the Pre-Trial Stipulation and Order. *See* PTO ¶¶ 62-70.

testified that she felt like Glaubach was retaliating against her after she spoke to Klein Zelman because Glaubach stopped speaking to her and publicly ignored her, and because Glaubach's driver (Dihal) started checking on her attendance and his assistant (Reich) started checking on her work.[292] Vargas also admitted, however, that Glaubach never threatened to fire her or to harm her in any way after she spoke to Klein Zelman.[293]

Glaubach vehemently denies retaliating against any of the Complainants, although he admits that he did not speak to Vargas and treated her as if "[s]he doesn't exist" after she spoke to Klein Zelman.[294] Glaubach also testified that the investigation was retaliatory against him.[295] This contention finds support in Klein Zelman's report, which suggests that Slifkin and Balk started the investigation in reaction to Glaubach's criticisms of them. The report concludes, for example, that "it appears unlikely that Complainants would have pursued filing 'formal' complaints against Glaubach, or that Glaubach's conduct would have been investigated, but for the escalating issues between Glaubach and Balk."[296] Glaubach

---

[292] Tr. 784-93 (Vargas).

[293] Tr. 797-99 (Vargas).

[294] Tr. 280-81 (Glaubach).

[295] Tr. 260 (Glaubach).

[296] PTO ¶ 64; JX 195 at 19. The Klein Zelman report also states that "Slifkin, Balk and [Hold-]Weiss did not decide to investigate Glaubach's behavior until after the [September 8, 2014] door slamming incident with Balk," and that the "Complainants generally do not

also points out that DiMaggio admitted that he did not retaliate against her in any way except by naming her (along with ten others) as a defendant in the New York Action for her involvement in the alleged tax fraud scheme.[297] As mentioned above, the court denied DiMaggio's motion for summary judgment on this claim.[298]

Based on this record, I find that Glaubach acted improperly to make Vargas feel uncomfortable at the office after he learned about the Klein Zelman investigation, but that his conduct was directed at Vargas and was not motivated by a desire to gain any personal benefit for himself to the Company's detriment or to otherwise harm the Company so as to constitute bad faith.[299]

In sum, although all of the conduct discussed above is troubling, it does not constitute a breach of the duty of loyalty. None of this conduct afforded Glaubach any personal benefit at the Company's expense, none of it was motivated by an

---

document Glaubach's behavior until late August or early September 2014 when Glaubach's treatment of Balk seemed to significantly worsen." *Id.*

[297] DiMaggio Dep. 152-54.

[298] *See supra* Section I.R.

[299] No authority applying Delaware law has been brought to the court's attention addressing a breach of fiduciary duty claim based on allegations of retaliation against employees of a corporation. Outside of Delaware, one court has held that allegations of sexual harassment would not constitute a breach of a corporate fiduciary's duty of loyalty. *See Pozner v. Fox Broad. Co.*, 74 N.Y.S.3d 711, 713-14 (N.Y. Sup. Ct. 2018) (concluding that a claim for breach of the fiduciary duty of loyalty against a former executive vice president based on allegations of sexual harassment was not "tenable" because the duty of loyalty "has only been extended to cases where the employee act[s] directly against the employer's interests—as in embezzlement, improperly competing with the current employer, or usurping business opportunities") (internal quotation marks omitted).

intention to harm Personal Touch, and none of it resulted in any apparent harm to the Company. Accordingly, judgment will be entered in Glaubach's favor with respect to this aspect of Count I of the Amended Complaint.

**D.** **The Company Is Entitled to a Declaration that its Termination of Glaubach's Employment Was Proper and Valid**

In Count IV of the Amended Complaint, the Company seeks a declaration that "Glaubach's employment was properly and validly terminated" under his Employment Agreement.[300] Reciprocally, Glaubach asserts in his counterclaim that he was invalidly terminated and seeks $302,739.73 in damages, "representing the remaining value due under his Employment Agreement, plus pre- and post-judgment interest."[301]

The resolution of these two claims turns on the application of Section 5.2(c) of the Employment Agreement, which was the cited basis for the Company's termination of the Employment Agreement and removal of Glaubach from his position as President of the Company.[302] Section 5.2(c) states, in relevant part, that:

> The Company shall . . . have the right to terminate the employment of [Glaubach] under this Agreement and [Glaubach] shall forfeit the right to receive any and all further payments hereunder . . . if [Glaubach] shall have committed any of the following acts of default:
>
> * * * * *

---

[300] Am. Compl. ¶ 213 (Dkt. 49).

[301] Def.'s Opening Br. 36.

[302] JX 323 at 2.

70

(c)  [Glaubach] shall have committed any material act of willful misconduct, dishonesty or breach of trust which directly or indirectly causes the Company or any of its subsidiaries to suffer any loss, fine, civil penalty, judgment, claim, damage or expense . . . .[303]

Under New York law, which governs the Employment Agreement,[304] the "essential elements of a breach of contract cause of action are 'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach.'"[305] The element of damages is not relevant to the Company's claim for declaratory relief, and it is not disputed that the Employment Agreement is a valid contract and that the Company performed its obligations under the contract. Thus, the only open question is whether Glaubach breached Section 5.2(c) of the agreement.

The Company asserts that Glaubach breached this provision by usurping the opportunity to purchase the AAA Building. I agree.

To establish a breach of Section 5.2(c), the Company must prove that Glaubach committed a material act of either (i) willful misconduct, (ii) dishonesty, or (iii) breach of trust that caused the Company to suffer a loss. Glaubach's usurpation of the opportunity to purchase the AAA Building clearly was a material

---

[303] JX 26 § 5.2(c).

[304] *Id.* § 9.5.

[305] *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (N.Y. App. Div. 2014) (quoting *Dee v. Rakower*, 976 N.Y.S.2d 470, 474 (N.Y. App. Div. 2013)).

act that caused the Company to suffer a loss for the reasons discussed previously, *i.e.*, it involved the purchase of a building located on a property uniquely valuable to the Company given its location, for a significant sum ($1.8 million plus six months of free rent), and caused the Company to suffer a loss warranting an award of $2.1 million in damages. The usurpation also is of a character that fits within each of the three types of acts that can trigger Section 5.2(c).

Glaubach's usurpation constituted a material act of "willful misconduct" because he intentionally violated his fiduciary duties.[306] The usurpation constituted a material act of "dishonesty" because, for months, Glaubach intentionally hid from the Company his efforts to purchase the building for himself to ensure that the Company did not bid on the property.[307] And the usurpation constituted a material "breach of trust" because it amounted to a flagrant breach of Glaubach's duty of loyalty by putting his personal self-interests ahead of Personal Touch's corporate interests.

In *Guth* itself, the Delaware Supreme Court explained that, "[w]hile technically not trustees," "[c]orporate officers and directors are not permitted to use their *position of trust* and confidence to further their private interests" because "they

---

[306] *See supra* Section III.A.

[307] Tr. 397-400 (Glaubach).

72

stand in a fiduciary relation to the corporation and its stockholders."[308]   Here, contrary to the duty of loyalty he owed to Personal Touch, Glaubach willfully and dishonestly used his position of trust as a fiduciary to further his own self-interest by taking for himself a valuable corporate opportunity in the form of the AAA Building.   Based on that breach, the Company was warranted in terminating Glaubach's employment with the Company.[309]

* * * * *

For the reasons stated above, the Company is entitled to a declaration that its termination of the Employment Agreement and removal of Glaubach from his position as the Company's President were proper and valid.  Accordingly, judgment will be entered against Glaubach and in the Company's favor with respect to Count IV of the Amended Complaint and Glaubach's counterclaim.

### E.   The Company Has Failed to Prove that Glaubach's Compensation Should Be Forfeited Under the Faithless Servant Doctrine

In Count III of the Amended Complaint, the Company seeks to recoup under the New York "faithless servant" doctrine approximately $2 million in compensation

---

[308] 5 A.2d at 510 (emphasis added).

[309] The Company also asserts that Glaubach breached Section 5.2(c) by engaging in self-dealing and retaliating against the sexual harassment Complainants.  Given the court's finding that the usurpation of the AAA Building constitutes a breach of Section 5.2(c), the court does not reach those issues.

Glaubach earned in the three years leading up to June 24, 2015, when he was terminated.[310] The Company has failed to demonstrate a basis for this relief.

The faithless servant doctrine is based on agency law and has roots in New York law going back to the late 1800s.[311] As the Second Circuit has explained, "[u]nder New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties."[312]

"In order to make out a claim of breach of the duty of loyalty in New York—sometimes referred to as the 'faithless servant doctrine'—the employer plaintiff must show (1) that the employee's disloyal activity was related to 'the performance of his duties' . . . and (2) that the disloyalty 'permeated the employee's service in its most material and substantial part.'"[313] If an employee is found to be faithless, the

---

[310] Am. Compl. ¶¶ 202-06; Pl.'s Opening Br. 56, 60; PTO ¶¶ 24-27.

[311] *See Carman v. Beach*, 63 N.Y. 97 (N.Y. 1875); *Murray v. Beard*, 7 N.E. 553 (N.Y. 1886).

[312] *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (internal quotation marks omitted). The interplay between the faithless servant doctrine under New York law for an individual resident in New York who is an officer of a Delaware corporation and thus owes fiduciary obligations governed by Delaware law is not clear to the court. The court assumes without deciding that the doctrine can be applied in this scenario.

[313] *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009) (quoting *Phansalkar*, 344 F.3d at 200, 203).

remedy is forfeiture of compensation.[314] With respect to the second element of the claim, another court has explained that, to be entitled to forfeiture under the faithless servant doctrine, the employer must show a "persistent pattern of disloyalty."[315]

These authorities are consistent with Personal Touch's articulation of the operative legal standard. Citing *City of Binghamton v. Whalen*,[316] the Company contends that under the faithless servant doctrine, "[a]n employee who has engaged in repeated acts of disloyalty must forfeit the compensation he received from his employer."[317]

Here, the Company has failed to prove that Glaubach engaged in a persistent pattern or repeated acts of disloyalty in performing his duties as an officer of Personal Touch during the three years predating his termination so as to warrant forfeiture of the compensation he received in that capacity during that period. To be sure, Glaubach breached his fiduciary duty of loyalty by usurping a corporate opportunity in the form of the AAA Building. But as egregious as that conduct was, it was an isolated incident that occurred late in Glaubach's tenure as President of the Company. With respect to all of the other acts identified in the Company's post-trial

---

[314] *City of Binghamton v. Whalen*, 32 N.Y.S.3d 727, 728-29 (N.Y. App. Div. 2016).

[315] *Bon Temps Agency, Ltd. v. Greenfield*, 622 N.Y.S.2d 709, 710 (N.Y. App. Div. 1995) (quoting *Schwartz v. Leonard*, 526 N.Y.S.2d 506, 508 (N.Y. App. Div. 1988)).

[316] 32 N.Y.S.3d at 728.

[317] Pl.'s Opening Br. 56.

briefs for application of the faithless servant doctrine—the provision of healthcare services to Shechtman, the $133,177 payment to Shechtman, and the alleged retaliation against the Complainants[318]—Glaubach did not commit any breaches of fiduciary duty for the reasons explained above.  Accordingly, judgment on Count III of the Amended Complaint will be entered in Glaubach's favor.

### F.  Glaubach Acted in Bad Faith as a Director in Two Respects After His Termination as President of the Company

The Company's final two fiduciary duty claims concern actions Glaubach took after he was terminated as President in June 2015 but while he was still a director of the Company:  (i) sending anonymous letters over an eight-month period

---

[318] *Id.* at 56, 60; Pl.'s Reply Br. 35.  In its post-trial briefs, the Company does not argue that Glaubach's involvement in the Jamaica Property lease is relevant to its faithless servant claim, and thus waived that argument.  *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").  Even if the court were to put this transaction into the mix, the outcome would not change for two reasons.  First, two unrelated and distinct breaches of duty still do not amount to a persistent pattern of disloyalty so as to warrant forfeiture of one's entire compensation.  *See Phansalkar*, 344 F.3d at 202 (forfeiture warranted where defendant's disloyal actions "occurred repeatedly, in nearly every transaction on which he worked"); *Schanfield*, 663 F. Supp. 2d at 321 (forfeiture warranted where employee "had sent hundreds of confidential or privileged SCA documents from his SCA computer to third parties"); *Whalen*, 32 N.Y.S.3d at 728 (forfeiture warranted where Director of Parks and Recreation admitted to "stealing more than $50,000 from plaintiff over the course of a nearly six-year period").  Second, the circumstances concerning the Jamaica Property lease are qualitatively different than those concerning the AAA Building.  The Jamaica Property lease was approved by both Glaubach and Marx in November 2013—before the Company had installed an independent Board majority in 2014—and it is undisputed that the rent term was negotiated by Marx, not Glaubach.  Although the court has found Glaubach liable for one-half of the amount of the above-market rent associated with the Jamaica Property lease given its self-dealing nature, Glaubach's role in this transaction has a completely different complexion than his secret usurpation of the AAA Building.

extending from March to November 2016;[319] and (ii) attempting to disrupt the Company's loan negotiations with its primary lender (MidCap) in the summer of 2016. The Company argues that each of these actions amounts to a breach of the duty of loyalty. I agree and will address each category in turn, applying the same fiduciary duty principles outlined above in Section III.C.

Beginning in March 2016, Glaubach orchestrated sending over fifty letters anonymously to at least sixteen different individuals associated with the Company, including all of the other Board members, numerous Company officers and employees, outside counsel, and even some of their spouses.[320] The letters were addressed to the recipients' homes; contained biblical references and disturbing images; suggested that the recipients were guilty of crimes, infidelity, and other offenses; and plainly were intended to provoke anxiety when they were opened.[321] A sampling of the letters follows:

- Letters sent to several Board members stating: "To all sinners BLOOD was the first plague[,] nine to follow, repent before its [*sic*] too late."[322]

---

[319] *See* JX 374 (dated March 24, 2016); JX 473 (dated November 17, 2016).

[320] PTO ¶ 121-24; *see* JX 374; JX 397; JX 398; JX 401; JX 402; JX 403; JX 405; JX 406; JX 407; JX 408; JX 410; JX 411; JX 415; JX 416; JX 417; JX 418; JX 419; JX 420; JX 421; JX 422; JX 445; JX 446; JX 447; JX 457; JX 458; JX 460; JX 461; JX 467; JX 473; JX 490; JX 495; JX 500; JX 501; JX 503; JX 504; JX 515; JX 640.

[321] *See supra* Section I.N; PTO ¶¶ 125-31.

[322] JX 387; JX 389; JX 495.

- A letter addressed to Marx's wife, Frances Marx, stating that her husband had engaged in "sexual indiscretions."[323]

- Letters sent to multiple Board members and outside counsel for the Company (Brum) and for the Board's Audit Committee (James Alterbaum) along with his wife, some with biblical verses and a picture of a noose,[324] and others suggesting they would be stricken by biblical plagues.[325]

- Letters sent to Board members and Company employees suggesting they would be prosecuted and/or jailed for crimes.[326]

- A letter sent to a Company employee after one of her parents was injured containing an image of an x-ray of a broken bone that asked: "Who in your family is going to be stricken next as a result of your sins?"[327]

The letters had their intended effect. One employee explained that his wife started crying when she opened one of the letters.[328] Another employee recounted a similar experience: "What frightened my wife the most, that we were receiving these kinds of threatening letters at our home. Okay. I don't need to say more."[329] As

[323] Tr. 323 (Glaubach); JX 401.

[324] JX 405; JX 406; JX 407; JX 496.

[325] JX 410; JX 411; JX 505.

[326] *See, e.g.*, JX 374; JX 377; JX 397; JX 398; JX 399; JX 445.

[327] Tr. 145 (Goff); JX 467.

[328] Calabro Dep. 171-72.

[329] Waldman Dep. 223.

director Goff testified, the letters were "extremely distressing to everybody involved."[330]

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over" a director's self-interest.[331] Given the intended audience, and the magnitude, nature, and duration of the anonymous letter-writing campaign that Glaubach orchestrated, his conduct to my mind is inexplicable as anything but an act of bad faith. The sheer pervasiveness of the letter-writing and the inclusion of spouses as targets of his letters belie the notion that Glaubach was merely "blowing off steam," as he testified.[332] Rather, the evidence shows that Glaubach was engaged in a systematic effort to harass and annoy the entire management structure of the Company, the logical and foreseeable consequence of which was to hurt morale and create an enormous distraction of time and resources to the detriment of the Company.[333] In doing so, Glaubach exalted his own personal interests while serving as a fiduciary of the Company above the best interests of Personal Touch and thus acted in bad faith in breach of his duty of loyalty.

---

[330] Tr. 147 (Goff).

[331] *Cede & Co.*, 634 A.2d at 361.

[332] Tr. 293 (Glaubach).

[333] *See, e.g.*, Tr. 147 (Goff) (testifying that the anonymous letters "became an incredible disruption to the Company" as a "distraction of time and effort").

79

I reach the same conclusion with respect to Glaubach's letter-writing to MidCap, the Company's primary lender, during the summer of 2016. At that time, the Company was negotiating to resolve certain loan covenant defaults in order to preserve its lending relationship with MidCap. Having learned that the Company was in the midst of these negotiations through attending Board meetings,[334] Glaubach interjected himself and portrayed the Company to MidCap in a highly negative light in a series of letters ostensibly calculated to sabotage the Company's relationship with MidCap in order to advance his own interests.[335]

In a letter addressed to a managing director of MidCap, for example, Glaubach described as "fraudulent" the continuing education expense scheme and the Company's tax returns for this period:

> My purpose in reaching out, was to get the answers to a couple of questions and also to inform you that towards the end of 2014, Personal Touch was being audited by the IRS and the NYS Department of Taxation. At that time, David Slifkin, our then CEO and Mr. Robert Marx hired James Sherwood, a tax attorney and Leon Reimer, a forensic accountant to do a complete review of Personal Touch's records.
>
> Sherwood and Reimer found that David Slifkin, Robert Marx and about 20 other employees fraudulently characterized salary payments as reimbursements for continuing education expenses. As a result, fraudulent tax returns were filed.

---

[334] Tr. 416 (Glaubach).

[335] JX 427; JX 437; JX 439.

> Two years ago I brought this information to the attention of the board of directors and they refused to do anything. That is a major reason why I had to bring a lawsuit against them in March of 2015. As such, I will not sign any documents authorizing another amendment to the loan agreement.[336]

Notably, Glaubach openly admits that he was not concerned about the damage this letter or the others he sent to MidCap might do to the Company's relationship with its lender:

> Q. Dr. Glaubach, you sent all three of these letters in the summer of 2016. Correct?
>
> A. Yes. 100 percent.
>
> Q. And you weren't concerned at all that MidCap might stop lending money to Personal Touch. Correct?
>
> A. I wasn't interested in that.
>
> Q. And you weren't at all worried that MidCap might refuse to negotiate its loan agreement with Personal Touch as a result of your letters. Correct?
>
> A. That was not my concern.[337]

Relying on *Odyssey Partners, L.P. v. Fleming Companies, Inc.*,[338] Glaubach argues that he did not breach his duty of loyalty in communicating with MidCap because he was only attempting to protect his interests as a creditor of the Company

---

[336] JX 437.

[337] Tr. 427 (Glaubach).

[338] 1996 WL 422377 (Del. Ch. July 24, 1996).

rather than "acting in a fiduciary capacity."[339]  In *Odyssey*, the court commented that "fiduciary obligation does not require self-sacrifice . . . .  Thus one who may be both a creditor and a fiduciary . . . does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights."[340]

Glaubach's argument fails because his assertion that he was merely acting to protect his interests as a creditor cannot be squared with the evidence.  In his letters to MidCap, Glaubach asked few questions relevant to his status as a creditor.  Glaubach instead made concerted efforts to place the Company in a bad light and actively discouraged MidCap from continuing to lend to the Company.  Specifically, in a letter addressed to Leon Black, the Chairman of the company that manages MidCap, Glaubach wrote:  "If you extend them credit, you are doing so at your own risk."[341]  In that same letter, Glaubach did not even mention his status as a creditor; the letter only said negative things about the Company's financial condition.[342]  Glaubach's letters thus cannot reasonably be understood to have been motivated by a bona fide exercise of creditor rights.

\* \* \* \* \*

---

[339] Def.'s Opening Br. 45-46.

[340] 1996 WL 422377, at \*3.

[341] JX 439; Tr. 420-21 (Glaubach).

[342] JX 439.

For the reasons explained above, the court concludes that Glaubach acted in bad faith and breached his fiduciary duty of loyalty by (i) orchestrating the sending of the anonymous letters and (ii) attempting (albeit unsuccessfully) to disrupt the Company's negotiations with MidCap. The Company does not seek damages with respect to either of these matters, thus the only relief to be granted is a declaration of these breaches of duty.[343]

## G. Attorneys' Fees

The Company requests that the court award it attorneys' fees and costs for the expenses it incurred in this litigation, to be paid by Glaubach. The request is denied.

Delaware follows the "American Rule," which provides that litigants "are generally responsible for paying their own counsel fees, absent special circumstances or a contractual or statutory right to receive fees."[344] Special circumstances include:

> (1) the presence of a common fund created for the benefit of others; (2) where the judge concludes a litigant brought a case in bad faith or through his bad faith conduct increased the litigation's cost; and (3) cases in which, although a defendant did not misuse the litigation process in any way, . . . the action giving rise to the suit involved bad faith, fraud, conduct that was totally unjustified, or the like and attorney's fees are considered an appropriate part of damages.[345]

---

[343] *See* PTO ¶ 155.

[344] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686 (Del. 2013) (citations and internal quotation marks omitted).

[345] *Id.* at 687 (internal quotation marks omitted).

More broadly, this court "may award fees in the limited circumstances of an individual case [that] mandate that the court, in its discretion, assess counsel fees where equity requires."[346]

The court declines to exercise its discretion to shift fees in this case. As the prior discussion reflects, the outcome of this case is very much a split decision. The Company won some significant claims and lost a number of others. This litigation was protracted, hard fought, and involved some troubling conduct, but the conduct at issue did not rise to the level of such egregiousness so as to warrant a deviation from the American Rule. Thus, the Company's request for an award of attorneys' fees is denied.

## IV. CONCLUSION

For the reasons explained above, judgment will be entered in the Company's favor on Count I of the Amended Complaint, in part, entitling the Company to an award of damages in the amount of $2,735,000 and declaratory relief. Judgment also will be entered (i) in the Company's favor on Count IV of the Amended Complaint and on Glaubach's counterclaim, entitling the Company to declaratory relief; and (ii) in Glaubach's favor on Counts II, III, and the remaining parts of Count I of the Amended Complaint.

---

[346] *Id.* (internal quotation marks omitted).

The parties are directed to confer and to submit a form of final judgment and order to implement this decision within five business days. The form of final judgment and order should address pre-judgment interest,[347] recognizing that the amount of damages for the usurpation claim is based on a valuation of the AAA Building as of the time of trial, and post-judgment interest using the Delaware legal rate. Each party will bear its own costs.

**IT IS SO ORDERED.**

---

[347] *Glidepath Ltd. v. Beumer Corp.*, C.A. No. 12220-VCL, at 56-57 (Del. Ch. Feb. 21, 2019) ("In Delaware, pre-judgment interest is awarded as a matter of right.") (citing *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485-87 (Del. 2011)).